**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____

|   |   |   |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| STEVEN J. ANCONA | ) | Case No. 14-10532 CGM |
| | ) | |
| Debtor. | ) | |
| | ) | |

_____

MEMORANDUM DECISION ON DEBTOR'S
MOTION FOR SUMMARY JUDGMENT

APPEARANCES:

ROSENBERG & ESTIS, P.C.
*Special Counsel to the Debtor,*
733 Third Avenue
New York, New York 10017
By:    Howard W. Kingsley, Esq. (argued)

PICK & ZABICKI LLP
*Counsel to the Debtor*
369 Lexington Avenue, 12th Floor
New York, New York 10017
By:    Douglas J. Pick, Esq.
        Eric C. Zabicki, Esq.

McLAUGHLIN & STERN, LLP
*Attorneys for 3 West 16th Street, LLC*
260 Madison Avenue
New York, New York 10016
By:    Matthew D. Sobolewski, Esq. (argued)
        Chester R. Ostrowski, Esq.

CECELIA G. MORRIS
CHIEF UNITED STATES BANRUPTCY JUDGE

Before the Court is the Debtor's Motion for Summary Judgment (the "Motion"[1]),

pursuant to Federal Rules Civil Procedure 56, in connection with his objection to the amended

---

[1]    As used herein, "Motion" refers to the Debtor's Memorandum of Law in Support of Summary Judgment, ECF No. 145 (as contrasted with the Notice of Debtor's Motion for Summary Judgment, ECF No. 138).

claim of 3 West 16th Street LLC (the "Landlord") in this proceeding.  For the reasons set forth

below, the Motion is granted in part and denied in part.

## Jurisdiction

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334 and the Standing

Order of Reference signed by Chief Judge Loretta A. Preska dated January 31, 2012.  This is a

"core proceeding" under 28 U.S.C. §157(b)(2)(B) (allowance or disallowance of claims against

the estate).

## Background

### *The Parties and Building History*

Since 1945, the National Council of Young Israel ("NCYI"), the then owner of the

building located at 3 West 16th Street (the "Building"), had provided portions of space within the

Building for the Sixteenth Street Synagogue ("Sixteenth Street") and Magen David of Union

Square Synagogue ("DMUSS" and together with Sixteenth Street, the "Synagogues").  *See*

Landlord's Response to Debtor's Rule 7056-1 Statement of Undisputed Material Facts ¶¶ 2-3,

ECF No. 150 ("Undisputed Facts Stmt").  In or around 1999, NCYI wanted to sell the Building

"tenant free," and the Synagogues were asked to vacate.  *Id.* at 4; Ancona Rule 1007-2 Aff.

¶ 5, ECF No. 2.  Protracted litigation between NCYI and the Synagogues then followed, and in

2005, the Debtor was consulted to help the parties reach a resolution.  Undisputed Facts Stmt ¶ 5.

To allow the Synagogues to continue occupying the Building, the Debtor proposed to purchase

the Building (by procuring third party financing) for the purpose of converting the upper floors

to condominium units, and donate the basement and first and second floors (along with any

profits) to the Synagogues.  *Id.* ¶¶ 6, 9.  Towards that end, the Synagogues and NCYI signed a

settlement agreement by which, among other things, the Building would be sold to the Landlord

entity that the Debtor formed.  *Id.* ¶¶ 7-8.

Thereafter, an investor, Jack Braha ("Braha"), agreed to finance the purchase and renovation of the Building. *See* Ancona Aff. in Support of Summary Judgment ¶ 27, ECF No. 155. In order to take advantage of certain tax benefits, the transaction was structured such that Braha would assume ownership and control of the Landlord entity, acquire the Building outright using proceeds from the sale of another property, and lease back the Building to an entity owned and controlled by the Debtor. *Id.* ¶¶ 29-30. On March 24, 2006, the Building was sold to the Landlord for $5.4 million, and on the same day, the Landlord and 3 West Development, LLC (the "Tenant"), an entity owned and controlled by the Debtor, entered into a 35-year triple-net lease (the "Lease") for the Building.[2] Undisputed Facts Stmt ¶¶ 11-13; *see* Lease (Ex. D to Ancona Aff. in Support of Summary Judgment).

The Lease provided that the Tenant would pay base rent, which was to be computed using a formula set forth in its Exhibit B, and that all charges other than base rent due under the Lease, including damages, would be deemed "Additional Rent" or "additional rent." *See* Lease Article 2. The Lease also provided that the Landlord would fund up to $2,850,000 for pre-approved alterations. *See* Lease Article 14, Ex. C to Lease. Under the Lease, the Tenant agreed to "cause the Construction of the Pre-Approved Alterations to be [c]ompleted with diligence and continuity…." *Id.* at Article 35.4. The Landlord agreed to "execute such documents, take such reasonable action and cooperate in all respect as may be required by the tenant to further any alteration, including the Pre-Approved Alteration…." *Id.* at Article 9.5.

In accordance with the Lease, the Debtor entered into a Guaranty and Indemnity dated March 24, 2006 (the "Guaranty"), pursuant to which the Debtor:

---

[2] The "Term" of the Lease runs from March 24, 2006 to midnight on April 1, 2041, unless sooner terminated. *See* Lease Article 2.1. A "triple net" lease is a common reference to a lease where the tenant is obligated to pay, in addition to rent, real property taxes, insurance and maintenance.

> unconditionally and irrevocably guarantees to the [Landlord] the full and punctual payment, when due, whether at the stated due date, by acceleration or otherwise of forty-five percent (45%) of the obligations of the [Tenant] under the Lease. Additionally, [the Debtor] agrees to indemnify the [Landlord] from and against forty-five percent (45%) of all monetary losses associated with the [Landlord's] ownership of the [Building], other than consequential losses.

*See* Guaranty ¶ 1(a) (Ex. E to Ancona Aff. in Support of Summary Judgment). Although the parties presented different accounts of who was at fault, it is undisputed that after the Lease and Guaranty were entered into, the Debtor and Landlord had multiple disagreements during the renovation of the Building and the relationship quickly soured. The renovation stopped and the deal fell apart. *See* Ancona Aff. in Support of Summary Judgment, ¶ 34; Braha Decl. in Opp. to Summary Judgment, ¶¶ 82-84, ECF No. 153 ("Braha Decl").

Beginning January 2008, rent under the Lease was due. Exhibit B to the Lease states in relevant part:

> The foregoing notwithstanding, whether or not the Tenant receives any Distributable Cash by January 1, 2008, Tenant shall pay to Landlord on the first of the month on a monthly basis an amount equal to the lesser of (i) $1,191,849.96 per annum, for a monthly rental of $99,320,83 … or (ii) an amount equal to 10% per annum (0.833% per month) of the Landlord's then outstanding or unreimbursed monetary outlays in connection with the purchase of the property plus the Tenant Pre-Approved Alteration Fund, or similar financing of improvements by Landlord.

The Landlord calculated the monthly rent as $84,394.63, pursuant to the formula set forth in Exhibit B. Undisputed Facts Stmt ¶ 25. Rent totaling $253,183.89 ($84,394.63 x 3) was paid by the Tenant to the Landlord for the months of January, February, and March 2008. *Id.* ¶ 26. The Tenant did not pay any rent for the months of April, May, and June, 2008. *Id.* ¶ 27. By letter dated May 8, 2008, the Landlord terminated the Lease, effective June 7, 2008 (the "Termination Date"). *Id.* ¶ 28.

*The State Court Litigation*

Around the same time, in early 2008, the Landlord and the Synagogues were engaged in litigation in New York Supreme Court over possession and ownership of the Building (the "State Court Action"). *See* Ancona Aff. in Support of Summary Judgment ¶ 38. In the State Court Action, the Landlord filed a third-party complaint against the Debtor, seeking to enforce the Guaranty. *Id.* ¶ 39. While the State Court did not determine any of the amounts that were allegedly due and owing under the Lease and the Guaranty from the Tenant and Debtor, respectively, the State Court did find, in its summary judgment order dated January 11, 2010, that: (1) the Landlord had a fee simple interest in the Building, (2) the Tenant and Synagogues possessed no equitable ownership interest through impressment of a trust upon the Building, (3) pursuant to the terms of the Lease, the Tenant's interest was legally terminated on June 7, 2008; and further, that the Debtor "raise[d] no defense to the enforcement of the Guaranty []." *See Magen David of Union Square v. 3 West 16th St., LLC*, Index No. 600573/2008 (N.Y. Sup. Ct. Jan. 11, 2010) (unpublished) ("Summary Judgment Decision," Ex. 3 to Landlord's amended proof of claim); Undisputed Facts Stmt ¶ 33. On appeal, the Appellate Division, First Department, affirmed the Summary Judgment Decision, and further found that "the motion court properly granted the [Landlord's] motion for payment of use and occupancy since March 2008." *See Magen David of Union Square v. 3 West 16th St., LLC*, 89 A.D.3d 24, 34 (1st Dep't 2011) (the "Appellate Decision").

On November 3, 2011, the Debtor, the Landlord and Sixteenth Street entered into a Stipulation and Order pursuant to which the parties consented to the immediate entry of a final judgment of possession and warrant of eviction, granting the Landlord legal possession of the Building. *See* Stipulation and Order (Ex. E to Braha Decl). Notwithstanding the Stipulation and

Order, the Synagogues continued to remain in possession of the Building.  Undisputed Facts

Stmt ¶¶ 29-30.  On January 22, 2013, pursuant to a formal eviction, the Landlord obtained

physical possession of the entire Building.  *Id.*

*The Chapter 11 Proceeding*

On March 9, 2014, the Debtor filed a voluntary petition under chapter 11.[3]  On April 29,

2014, the Landlord filed a proof of claim in the amount of $6,831,929.46 (the "Initial Claim") for

damages arising from the Debtor's Guaranty and Tenant's breach of the Lease.  *See* Claim No. 7

on Claim Register.  The Debtor objected to the Initial Claim as being insufficiently documented

and sought to reduce it to an unspecified amount to be determined following discovery and an

evidentiary hearing.  *See* Motion to Reduce Claims, ECF No. 3.  Unable to reach a consensual

resolution on the claim objection, the Debtor requested a pre-motion conference in accordance

with Local Bankruptcy Rule 7056-1.  *See* Letter dated April 29, 2015, ECF No. 109.  At the pre-

motion conference, the Court directed the Landlord to file an amended proof of claim so as to

avoid "attacking a moving target."  *See* Pre-motion conference Hr'g Tr. at 20, ECF No. 127.  On

July 10, 2015, the Landlord filed an amended proof of claim in the amount of $20,561,342 (the

"Amended Claim"),[4] which was followed by the Debtor's Answer and Affirmative Defenses to

the Amended Proof of Claim, ECF No. 130.

On September 4, 2015, the Debtor filed the instant Motion, seeking summary judgment

expunging the Amended Claim in its entirety.  The Motion also asks the Court to determine,

more specifically, the following issues as a matter of law:

---

[3]    The case was originally assigned to the Honorable Robert E. Gerber.  However, this matter has been referred to
the Honorable Cecelia G. Morris upon Judge Gerber's retirement, effective January 22, 2016.

[4]    The Amended Claim states that the Landlord is seeking "an amount to be determined at trial but in no event less
than $20,561,342."

a.  Does the statutory cap apply to a debtor that personally guaranteed a non-residential

lease?

b.  Did the landlord improperly inflate the monthly amount of Base Rent by including

amounts in the computation that were not authorized by the terms of the Lease?

c.  Can the Landlord hold the Debtor liable for the Tenant's "use and occupancy" under the

Guaranty?

d.  Is the Landlord entitled to recover real estate taxes and insurance charges under the

Lease, after the Lease was terminated?

e.  Is the Landlord entitled to late fees?

f.  Is the Landlord entitled to attorneys' fees?

g.  Is the Landlord required to reduce its damages by all rents it has received and will receive

in the future?

h.  Has the Landlord suffered any actual damages?

i.  Should the Amended Claim be reduced to zero and expunged because, *inter alia*, it was

filed in bad faith?

The Landlord opposes the Debtor's Motion, arguing that: (i) the Landlord does not have

adequate information on the Debtor's financial condition to present facts essential to justify its

position, and hence, the Motion should be denied pursuant to Federal Rule of Civil Procedure

56(d);[5] (ii) the Debtor has not satisfied the summary judgment standard that there is no genuine

dispute of material fact, and to the contrary, that there are numerous material facts in dispute

between parties; (iii) the statutory cap under section 502(b)(6), to the extent it applies at all,

---

[5]    Federal Rule of Civil Procedure 56(d) states: If a nonmovant shows by affidavit or declaration that, for specified
reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion
or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other
appropriate order.

should not apply to the Landlord's claims for non-rent damages; and (iv) amounts for base rent,

attorneys' fees, interest, late fees, real estate taxes and insurance are properly included and

calculated in the Amended Claim.  *See* Landlord's Opp. to Motion, ECF No. 149.

The Debtor's Motion to expunge and disallow the Landlord's Amended Claim entirely

and determine the issues set forth above is granted in part and denied in part, as more fully

discussed below.

## Discussion

*Summary Judgment Standards*

Federal Rule of Civil Procedure 56(a), made applicable here by Federal Rule of

Bankruptcy Procedure 7056,[6] provides in relevant part that "the court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  A factual dispute is genuine "if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party."  *McElwee v.

Orange*, 700 F.3d 635, 640 (2d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S.

242, 248 (1986)).

The burden is on the moving party to show the absence of a genuine issue of material

fact.  *See Jacobowitz v. Cadle Co. (In re Jacobowitz)*, 309 B.R. 429, 435 (S.D.N.Y. 2004) (citing

*Celotex Corp. v. Catrett*), 477 U.S. 317, 330 (1986)).  If the movant meets this burden, then the

non-moving party must set forth specific facts to show that there are triable issues of fact, and

"the mere existence of some alleged factual dispute between the parties will not defeat an

---

[6]     At the pre-motion conference, Judge Gerber directed that Part VII of the Federal Rules of Bankruptcy
Procedure governing adversary proceedings be made applicable to this contested matter pursuant to Bankruptcy
Rule 9014, and the Amended Claim be treated as a complaint, followed by an answer filed by the Debtor in
response.  *See* Pre-motion conference Hr'g Tr. at 21.

otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48;

*see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

When considering a motion for summary judgment, a court "should not weigh the

evidence or determine the truth of any matter." *Virgin Atlantic Airways Ltd. v. British Airways*

*PLC*, 257 F3d. 256, 262 (2d Cir. 2001) (citing *Anderson*, 477 U.S. at 248); *see also Breeden v.*

*Erie Islands Resort & Marina (In re Bennett Funding Group, Inc.)*, No. 02-80088, 2006 WL

3921933, at *7 (Bankr. N.D.N.Y. Oct. 13, 2006) ("The Court is not to weigh the evidence, assess

its probative value, or decide factual issues in the context of the motion for summary judgment.")

Summary judgment is improper "if there is any evidence in the record from any source from

which a reasonable inference could be drawn in favor of the non-moving party." *Howley v.*

*Stratford*, 217 F.3d 141, 151 (2d Cir. 2000).

## The Debtor's Motion

### A. Damages cap under section 502(b)(6)

Section 502(b)(6) provides that if an objection to a claim is made, the court "shall

determine the amount of such claim… and shall allow such claim in such amount, except to the

extent that if such claim is the claim of a lessor for damages resulting from the termination" of a

real property lease, such claim exceeds—

> (A)  the rent reserved by such lease, without acceleration, for the greater of one
> year, or 15 percent, not to exceed three years, of the remaining term of such lease,
> following the earlier of—
>> (i)  the date of the filing of the petition; and
>> (ii) the date on which such lessor repossessed, or the lessee surrendered,
>> the leased property; plus
> (B)  any unpaid rent due under such lease, without acceleration, on the earlier of
> such dates.

11 U.S.C. § 502(b)(6).

The legislative history to section 502(b)(6) shows that the policy behind this statutory cap is to "compensate the landlord for his loss while not permitting a claim so large (based on a long term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate." H.R. Rep. No. 595, 95th Cong., 2d Sess. 63 (1978) S. Rep. No. 95-989, at 63 (1978), *reprinted* in 1978 U.S.C.C.A.N. 5787, 5849. Although the statute does not explicitly make reference to damages resulting from a guaranty of a lease, most courts that have considered this issue have held that section 502(b)(6) applies to cap the claims of a lessor against a debtor guarantor of a lease. *See*, *e.g.*, *In re Episode USA, Inc.*, 202, B.R. 691 (Bankr. S.D.N.Y. 1996); *In re Arden*, 176 F.3d 1226 (9th Cir. 1999); *Cutler v. Lindsey (In re Lindsey)*, 1997 U.S. App. LEXIS 30502 (4th Cir. Va. 1997); *Flanigan v. Samalex Trust (In re Flanigan)*, 374 B.R. 568 (Bankr. W.D. Pa. 2007); *In re Henderson*, 297 B.R. 875 (Bankr. M.D. Fla. 2003*); In re Farley, Inc.*, 146 B.R. 739 (Bankr. N.D. Ill. 1992); *In re Interco, Inc.*, 137 B.R. 1003 (Bankr. E.D. Mo. 1992); *In re Thompson*, 116 B.R. 610 (Bankr. S.D. Ohio 1990).

Conceding the existence of this majority view, the Landlord nonetheless argues that the statutory cap does not apply to its claim against the Debtor under the Guaranty, and urges this Court to adopt the reasoning in *In re Danrik, Ltd.*, 92 B.R. 964 (Bankr. N.D. Ga. 1988) and *In re Dronebarger*, No. 10-10889, 2011 WL 350479, at *20 (Bankr. W.D. Tex. Jan. 31, 2011). The Court is not persuaded.

In *Dronebarger*, the court found that the section 502(b)(6) cap did not apply to the lessor's claim for damages against the debtors as joint guarantors of a commercial real property lease due to the court's belief, based on its reading of the Fifth Circuit's interpretation of *section 502(b)(7)* in *In re Goforth*, 179 F.3d 390 (5th Cir. 1999), that the Fifth Circuit *would have concluded* that section 502(b)(6) would not apply to a debtor lease guarantor. *See Dronebarger*,

2011 WL 350479, at *19-20.  The Fifth Circuit did not, in fact, hold that the section 502(b)(6)

cap would not apply to claims against a debtor lease-guarantor.

In *Danrik*, the court held that section 502(b)(6) did not limit the lessor's claim against the

debtor Danrik for damages under a lease guaranty given the facts of the "unusual case" where the

guarantor debtor was solvent, all other claims have been paid in full, the lessee (under the lease

in question) had itself not sought bankruptcy, and the claim was not disproportionately large.

*Danrik*, 92 B.R. at 972.  The *Danrik* court noted that allowing the lessor's claim in full (i.e.,

uncapped by section 502(b)(6)) would not "destroy the rehabilitation efforts of Danrik, since

Danrik has already been reorganized and the plan has been consummated" and "the debtor

escrowed more than the amount of the lessor's claim, pending the outcome of [the] objection."

*Id.* at 967, 971.

In this case, unlike *Danrik*, the Debtor has not yet filed his chapter 11 plan, let alone

consummated such plan; all other claims of the Debtor have not been paid in full, or even

determined at this stage; no reserve has been established for the Landlord's Amended Claim

pending resolution of this objection; the Landlord's claim appears to be disproportionately large;

and the Tenant-lessee did in fact file for bankruptcy.[7]  In sum, the "unusual" facts underlying the

analysis in *Danrik* are not present here.  *See also In re Episode USA, Inc.*, 202 B.R. 691, 695

(Bankr. S.D.N.Y. 1996) (declining to follow *Danrik* and noting the distinctions from *Danrik's*

"unusual" facts).

The Landlord further argues that the Court cannot determine the applicability of the

section 502(b)(6) cap without first determining the Debtor's solvency and whether the Debtor's

---

[7]    Although not presented by either party as an "undisputed fact," the Court takes judicial notice of the chapter 7
case of 3 West Development LLC, filed on March 5, 2014, as Case No. 14-10533 in the Bankruptcy Court for
the Southern District of New York.  The case was closed on September 3, 2015 following the entry of an Order
of Final Decree and the Chapter 7 Trustee's Report of No Distribution.

other claims are legitimate and will be fully paid, because such equitable factors "potentially

preclude application of the statutory cap to Landlord's Amended Claim."  Landlord's Opp.

at 5-7.  The Landlord is mistaken.

Notwithstanding the fact that this Court does not (and need not) adopt the rationale in

*Danrik* or *Dronebarger* as discussed above, neither case stands for the proposition that a court

must first find a debtor to be insolvent or determine all other claims against a debtor before

analyzing a claim under section 502(b)(6).  To do so would effectively rewrite the statute to

include a prerequisite or exception to section 502(b)(6)'s applicability where none exists, and

lead to the absurd result where landlord-creditors' claims against a debtor cannot be ascertained

until after a plan has been filed.  In fact, at least one court has found that a debtor's solvency

does not affect the applicability of the damages cap under section 502(b)(6).  *See In re Federated

Dep't Stores*, 131 B.R. 808, 817 (S.D. Ohio 1991).  In *Federated*, the lessor creditor argued that

the cap should not apply due to the fact that the claims of debtors' other creditors can be satisfied

even if the lessor's claim was allowed in full.  *Id.* at 816.  In rejecting the lessor's argument, the

*Federated* court explained:

> There is simply nothing in the plain language of § 502(b)(6) to suggest that a
> bankruptcy court may depart from the application of the cap on a lessor's claim
> any time the debtor is solvent or the court otherwise believes the equities of the
> case might warrant such a departure.

*Id.* at 817.  Although *Federated* was not addressing the applicability of section 502(b)(6)'s cap to

a debtor-guarantor of a lease, its analysis is nevertheless pertinent.  The same view was echoed

by the Ninth Circuit in *Arden*, and the bankruptcy court in *Flanigan*, both of which held section

502(b)(6) to apply to a claim against a debtor-guarantor.  *See Arden*, 176 F.3d at 1229 (stating

"[i]n light of *Ron Pair*, numerous courts have criticized *Danrik* for looking beyond the statutory

language."); *Flanigan*, 374 B.R. at 576 (concluding that "there is no equitable exception to application of [section 502(b)(6)] in favor of guarantors"); *see also* 4 *Collier on Bankruptcy*, ¶ 502.03[7][a] at 502-43 (16th rev. ed. 2012) (noting "the limitation on damages under section 502(b)(6) has been found to be absolute.").

Under the Supreme Court's decision in *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989), "[t]he plain meaning of legislation should be conclusive, except in the 'rare case [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" Here, application of the statutory cap is not at odds, but rather fits squarely, with the drafters' intent of preventing speculative, disproportionately large claims based on a long term lease—to wit, a claim by the Landlord for not less than $20.5 million, comprised partly of future rents under a 35-year long commercial lease.

In light of the overwhelming courts (including the Southern District Bankruptcy Court's decision in *Episode USA*) that have found the damages cap to apply to claims of lessors against debtor-guarantors of leases, and the policy goals that would be served here based upon the "plain meaning" statutory construction under *Ron Pair*, the Court concludes that section 502(b)(6) applies to cap the Landlord's claim against the Debtor under the Guaranty.

B. *Components of the Amended Claim*

The group of issues for which the Debtor next seeks summary judgment goes to the components of the Landlord's Amended Claim—in particular, the inclusion of interest, attorneys' fees, and construction and acquisition costs in the computation of Base Rent, liability for use and occupancy under the Guaranty, recoverability of real estate taxes and insurance charges post-termination, and the addition of late fees and attorneys' fees. The Debtor raises

multiple objections to the Landlord's entitlement and computation of (in some cases, specific amounts of) these components—for example, that:

- "interest is not an outlay or expense" and thus, not authorized by the Lease; Motion at 14;

- certain attorneys' fees in the amount of $46,000 "were paid for by Braha Properties, LLC," not the Landlord; *Id.* at 15;

- "an additional $778,160.73 for an assignment of contract to purchase the [B]uilding" was not set forth in the Landlord's interrogatories, closing statement, or the Amended POC; *Id.* at 15-16;

- Construction costs in the amount $160,000 cannot be included in Base Rent because "such amount was not paid by Landlord, but by Braha Properties"; *Id.* at 17;

- use and occupancy (for the holdover period between the Lease termination and the eviction during which the subtenant-Synagogues remained in possession of the Building) "is not an obligation under the Lease"; *Id.* at 18;

- "pursuant to Lease § 15.4(d), the Landlord [is] required to discount any liquidated damages 'to present worth at the rate of six percent (6%) per annum"; *Id.* at 19;

- "real estate taxes and insurance charges were due under the Lease only through the Termination Date" and "no insurance premiums were paid by Landlord for the period until the Lease terminated"; *Id.* at 21;

- "late fees on [] 'additional rent' charges… are not permitted pursuant to the terms of the Lease"; *Id.* at 21; and

- attorneys' fees (including "all fees incurred in this bankruptcy proceeding") are not 'rent' for purposes of §502(b)(6)" and "the billing parties are not the Landlord"; *Id.* at 22.

In response, the Landlord contends, *inter alia*, that:

- "interest was to be included in the Base Rent calculation" and cites to, among other things, statements in the Debtor's Verified Complaint in the State Court Action admitting, for example, that the Debtor "was required to pay [the Landlord] interest… at the rate of 10% per annum," the Appellate Decision noting that the Lease "contemplated that the landlord would recoup its equity… and interest," and the fact that the Debtor had not previously challenged, and indeed, actually paid, the Landlord's Base Rent (including interest) for the months of January, February, and March 2008; Landlord's Opp. to Motion at 24-26;

- the inclusion of an additional $778,160.73 for the assignment of contract rights to purchase the [Building] "is fully supported by documents exchanged during discovery in this proceeding and the Amended Claim"; *Id.* at 26;

- payment by Braha Properties of $160,000 in Alteration Fund Advances challenged by the Debtor were paid by Braha Properties, "on behalf of Landlord, in its capacity as the sole member of Landlord"; *Id.* at 26;

- use and occupancy is "nonetheless a 'monetary loss associated with [Landlord's] ownership of the [Premises]' for which Debtor agreed, unconditionally, to indemnify Landlord from and against 45%"; *Id.* at 29;

- real estate taxes and insurances are likewise properly included in the Landlord's rent since under the Guaranty, "Debtor agreed to 'indemnify [Landlord] from and against

forty-five percent (45%) of all monetary losses associated with [Landlord's]

ownership of the [Building], other than consequential losses"; *Id.* at 34; and

- Landlord made insurance payments from February 2013 to February 2014, "as a
  result of Tenant's failure to pay the costs of insurance."  Braha Decl ¶ 108.

In addition to arguments justifying the inclusion of specific line items in its computation,

the Landlord also maintains, as a general matter, that summary judgment is not appropriate at

this stage in the proceedings because "[g]iven the parties' clear disagreement as to what

constitutes a 'monetary outlay,' there is – at the very least – an ambiguity with regard to the

formula for determining Base Rent under the Lease.  An ambiguity relating to such a critical

aspect of the case is, alone, sufficient to preclude summary judgment in Debtor's favor."  In

further support of the Landlord's position that there are genuine issues of material fact, the

Landlord submitted a Rule 7056-1(c) Statement of Material Facts as to which there is a Genuine

Issue to be Tried, setting forth disputed material facts it asserts exists relating to Base Rent, use

and occupancy, attorneys' fees and costs, construction costs, obligations after Lease termination,

and mitigation of damages.  *See* Rule 7056-1(c) Stmt. of Material Facts as to Genuine Issues to

be Tried, ECF No. 151.

The Court finds that the Debtor has not met its burden of demonstrating the absence of a

genuine issue of material fact, entitling it to summary judgment.  In determining whether the

movant has met his burden, "the court is required to resolve all ambiguities and credit all factual

inferences that could be drawn in favor of the party against whom summary judgment is sought."

*Vivenzio v. Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010).  Here, the Landlord has raise sufficient

issues of disputed facts that are material to the determination of the components of the Amended

Claim.  For example, the language in Exhibit B of the Lease computes "Rental" as "(ii) an

amount equal to 10% per annum (0.833% per month) of the Landlord's then outstanding or

unreimbursed *monetary outlays* in connection with the purchase of the property…." (emphasis

added).  Ex. B to Lease.  The term "monetary outlays" is repeatedly relied upon by the Landlord

to explain the inclusion of assorted costs of the Landlord in connection with his acquisition of the

Building as part of the Base Rent calculation, and yet, is undefined under the Lease.

Similarly, under the Guaranty, the Landlord has contractually bound himself to guarantee

"forty-five percent (45%) of the *obligations* of the [Tenant] under the Lease… and agrees to

indemnify [the Landlord] from and against forty-five percent (45%) of all *monetary losses*

*associated with the [Landlord's] ownership of the Property*."  (emphasis added).  Again, these

terms are not defined.  While undefined terms do not always mean ambiguity (and even defined

terms can often be ambiguous), in this case, the undefined nature of multiple critical terms that

form the bases for the components of the Landlord's claim makes the Lease and Guaranty

susceptible to more than one interpretation.[8]

Such ambiguity in the operative text of the Lease and Guaranty, particularly where the

Landlord's claim is contractually based, renders summary judgment inappropriate.  *See*, *e.g.*,

*Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner &*

*Smith Inc.*, 232 F.3d 153, 157-58 (2d Cir. 2000) ("Summary judgment is generally proper in a

---

[8]   The ambiguity of these contracts is underscored by the Debtor's own position that the terms of the Guaranty is
unclear as to the scope of indemnification.  *See* Debtor's Reply Memorandum of Law in Further Support of
Summary Judgment at 9-10, ECF No. 171.  The Debtor cannot have it both ways—asserting that there are no
disputes of material fact, while also conceding an ambiguity in the Guaranty.  To the extent the Debtor's
ambiguity argument goes to how the Guaranty should be construed, it is premature.  The Court is not pre-
judging whether there is an ambiguity as to the scope of the indemnification that should be construed against the
Landlord.  The Court is merely finding ambiguity in the language that would give rise to a disputed issue of fact
for trial under a summary judgment standard.  *See*, *e.g.*, *Brady v. Colchester*, 863 F.2d 205, 210 (2d Cir. 1988)
("As a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in
favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be
resolved against the moving party.");  *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (noting that on a
summary judgment motion, the court must "view the evidence in the light most favorable to the non-moving
party and draw all reasonable inferences in its favor, and may grant summary judgment only when no
reasonable trier of fact could find in favor of the nonmoving party.") (internal quotations and citations omitted).

contract dispute only if the language of the contract is wholly unambiguous.") (internal citation omitted); *accord Luitpold Pharms., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 88 (2d Cir. 2015) ("Whether a contract is ambiguous in the first place presents a question of law.") (citations omitted).

The Landlord has raised other issues of disputed material facts beyond the ambiguous operative terms of the Lease and Guaranty. For example, the Debtor disputes the inclusion of certain attorneys' fees and construction costs on the basis that it was Braha Properties that had paid for such expenses, not the Landlord. Sworn statements in the Braha Declaration indicate that Braha Properties, as the sole member of the Landlord, made such payments on behalf of the Landlord, thereby disputing the distinction drawn by the Debtors of different payers. The sworn statements in the Braha Declaration also identified specific payments the Landlord has made in respect of real estate taxes and property insurance and referenced exhibits documenting these payments, in contravention to the Debtor's assertions that the Landlord did not pay taxes and insurance. *See* Braha Decl ¶¶ 65, 72, 97, 103.

The Court need not list every material factual issue in dispute for purposes of this analysis. The Court is satisfied that there are enough genuine issues of material fact at this time that require further findings by a trier of facts as to the various components included in the Landlord's damages calculation. Therefore, summary judgment must be denied on these issues.

*C. Mitigation of Damages*

The Debtor also argues that the Landlord must reduce the amount of its Amended Claim by rents the Landlord has received and will receive from new tenants of the Building.[9] Motion at 25. The Debtor further asserts that "all future rents must be applied to reduce the amount of any

---

[9]    The parties do not dispute that "[t]he Landlord has entered into six [n]ew [l]eases with various tenants to occupy the Building." Undisputed Facts Stmt ¶ 49.

allowed claim after the [*sic*] making the § 502(b)(6) calculation." *Id.* The Landlord counters

that any mitigation from new rents actually received should be applied to the Landlord's actual

damages, before application of the statutory cap.[10] *See* Landlord's Opp. to Motion at 30.

The Debtor's belief that mitigating new rents should reduce the Landlord's damages after

applying the statutory cap runs contrary to the existing caselaw. The established view is that any

resulting rents from a landlord's reletting of the leased premises are "deducted from the claim

before the damage cap of section 502(b)(6)(A) is calculated." 4 *Collier on Bankruptcy*,

¶ 502.03[7][i] at 502-48 (16th rev. ed. 2012); *see also In re Bob's Sea Ray Boats, Inc.*, 143 B.R.

229, 231 (Bankr. D.N.D. 1992) ("Any rents received in consequence of re-letting are not,

however, applied toward satisfaction of the section 502(b)(6) claim after making the statutory

calculations, rather such payments are deducted from the landlord's total actual lease termination

damages, before the section 502(b)(6) cap is applied.") (citing *In re Goldblatt Bros., Inc.*, 66

Bankr. 337 (Bankr. N.D. Ill. 1986)); *Fifth Avenue Jewelers, Inc. v. Great East Mall, Inc., (In re

Fifth Avenue Jewelers, Inc.)*, 203 B.R. 372 (Bankr. W.D. Pa. 1996) (same); *In re All for a

Dollar*, 191 B.R. 262 (Bankr. D. Mass. 1996) (same). Indeed, the Debtor's own cited authority

actually supports the *Landlord's* position that any mitigation of damages from reletting to the

new tenants should be factored into the Landlord's overall claim for damages, not from the

Landlord's capped damages under section 502(b)(6). *See In re Episode USA, Inc.*, 202 B.R. 691,

696 (Bankr. S.D.N.Y. 1996) ("Under § 502(b)(6), the allowable amount of a landlord's claim is

equal to the lesser of (i) its total rejection damages, *which may take mitigation into account*, and

(ii) the statutory cap computed under § 502(b)(6).") (emphasis added and citations omitted).

---

[10]  According to the Landlord, the Amended Claim already takes mitigation into account in that the post-eviction portion of its damages has been reduced by $661,775 (representing the rents received by the Landlord under the new tenants' leases as of the date of the Amended Claim). *Id.*

These same legal precedents also make clear that "Section 502(b)(6)(A) is not a formula for calculating damages; it is simply a method to cap damages calculated under the terms of the lease and state law." *In re USinternetworking, Inc.*, 291 B.R. 378, 380 (Bankr. D. Md. 2003) (citing *Steven Windsor, Inc.*, 201 B.R. 133, 135 (Bankr. D. Md. 1996)); *accord In re Peters*, 2004 Bankr. LEXIS 787, at *9 (Bankr. E.D. Pa. May 7, 2004) ("The amount of a landlord's damage claim before application of § 502(b)(6) is ascertained by reference to the lease and applicable state law.") (citing *In re Fifth Ave. Jewelers*, 203 B.R. at 376); *Unsecured Creditors' Comm. v. Strobeck Real Estate (In re Highland Superstores)*, 154 F.3d 573, 579 (6th Cir. 1998) (stating that courts have "uniformly held that a lessor's damages are computed in accordance with the terms of the debtor's lease and applicable state law, and then are limited by application of section 502(b)(6)") (citing *In re Gantos, Inc.*, 176 B.R. 793, 795 (Bankr. W.D. Mich. 1995)); *In re Iron Oak Supply Corp.*, 169 B.R. 414, 416-17 (Bankr. E.D. Cal. 1994) (same); *In re Thompson*, 116 B.R. 610, 613 (Bankr. S.D. Ohio 1990) (same).

Applying these cases to the facts here, the calculation of any mitigated damages from replacement tenants under the Lease must therefore be determined under the terms of the Lease and New York state law. Just *how* damages are to be mitigated under New York law—such as whether all future rents a landlord will receive from new tenants (as proposed by the Debtor), or only rents actually received by a landlord (as proposed by the Landlord), and whether the future rents remaining under the relevant term must then be discounted to the present value—has not been addressed by either the Debtor or the Landlord. As a result, the Court is reserving its decision, and directs the parties to submit supplemental briefs on the issue of how the Landlord's damages would be mitigated, *under New York law*, by the rents from the six new tenants at the Building, without regard to the application of the statutory cap under Section 502(b)(6). *See*

generally, *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 2016 Bankr. LEXIS 25, at \*46

(Bankr. S.D.N.Y. Jan. 4, 2016) (directing the parties to submit, pursuant to Federal Rule of Civil

Procedure 44.1, additional briefing on the applicability of Luxembourg law to the plaintiff's

claim where the litigants' expert opinions on Luxembourg law were inadequate); *KLG Gates*

*LLP v. Brown*, No. 13-CV-4972, 2013 U.S. Dist. LEXIS 177793, at \*2 (E.D.N.Y. Dec. 18, 2013)

(requiring parties to submit supplemental briefing on issue of appellate standing where issue was

not previously briefed by the parties).

### D.  Actual Damages of the Landlord

This Court was next asked to decide, as a matter of law, whether the Landlord has

suffered any actual damage.  The Debtor, in his Motion, makes the conclusory argument that

"the Landlord is, in fact, now in a better position than if the Landlord and the Project

Manager/Tenant had actually completed the Renovations and sold the condominium Units, and

has suffered no actual damages."  As purported evidence, the Debtor references a page-print of

an online listing that appears to show an asking price of $29,500,000 for the Building.  *See*

Motion at 27; Ancona Aff. in Support of Summary Judgment ¶ 55; Webpage printout (Ex. O to

Ancona Aff. in Support of Summary Judgment).  No details were provided as to how or from

whom this web page was obtained, when such listing was posted, for what purpose, how long

ago it was taken down, who had determined the asking price of $29.5 million and by what

method this valuation was arrived at, making its reliability and admissibility entirely

questionable.[11]  *See* Fed. R. Civ. Proc. 56(c)(4) ("An affidavit or declaration used to support or

---

[11]    The Court is not now making any determination as to the exhibit's admissibility at trial, as it is unclear whether
the Landlord has challenged the exhibit's admissibility.  Aside from the statement that "[t]he Debtor offers no
expert testimony or admissible evidence for his valuation of the [Building]," this issue is otherwise not
addressed by the Landlord.  *See* Braha Decl ¶ 55; Landlord's Opp. To Summary Judgment.  *Cf.* Fed. R. Civ.
Proc. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a
form that would be admissible in evidence.").

oppose a motion must be made on personal knowledge, set out facts that would be admissible in

evidence, and show that the affiant or declarant is competent to testify on the matters stated.");

*accord Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir.

2009) ("only admissible evidence need be considered by the trial court in ruling on a motion for

summary judgment."); *cf. Madanat v. First Data Corp.*, 282 F.R.D. 304, 311 (E.D.N.Y. 2012)

(finding that "information displayed on a website is hearsay that is not admissible under any

exception"); *Novak v. Tucows, Inc.*, No. 06-CV-1909, 2007 U.S. Dist. LEXIS 21269, at *15-19

(E.D.N.Y. Mar. 26, 2007) (granting motion to strike certain exhibits of web page printouts as

hearsay and for lack of authentication under Fed. R. Evid. 901); *U.S. v. Jackson*, 208 F.3d 633,

637 (7th Cir. 2000) ("The web postings were not statements made by declarants testifying at

trial, and they were being offered to prove the truth of the matter asserted. That means they were

hearsay.") (citing Federal Rule of Evidence 801).

        Even assuming that the web listing printout is admissible, it hardly demonstrates that the

Landlord is in a better position now than if the Tenant had not breached the Lease, and so has not

suffered any actual damages.  Accordingly, the Court cannot, at this stage, conclude that the

Landlord has not suffered any actual damages, and summary judgment as to this issue is denied.

*E.  Bad Faith Claim*

        The Debtor's final issue for determination, as a matter of law, is whether the Landlord's

Amended Claim should be reduced to zero and disallowed in its entirety based on bad faith.  The

Debtor, once again asserts in a conclusory manner that "the Amended Claim was presented for

the improper purpose of harassing, prejudicing and punishing the Debtor and, thus, the Landlord

is acting in extreme bad faith."  The alleged bad faith is the fact that the Landlord has not applied

the statutory cap under section 502(b)(6) to its claim, and the Amended Claim actually increased

from the Initial Claim.  *See* Motion at 10.  The Debtor has not cited a single case holding that the

failure of a landlord claimant to apply the statutory cap under section 502(b)(6) is, as a matter of

law, deemed bad faith on the part of such claimant.  Nor has the Debtor cited any authority in

support of the proposition that amending a claim for a greater amount than originally sought is,

as a matter of law, indicative of bad faith.

Application of section 502(b)(6) merely serves to cap the *allowed* amount of a lessor's

claim for damages resulting from the termination of a lease, it does not dictate the amount of

damages that a lessor may assert.  *See*, *e.g.*, *In re MDC Sys.*, 488 B.R. 74, 82 (Bankr. E.D. Pa.

2013) ("Section 502(b)(6) does not impact the amount of the landlord's claim; it determines only

the allowed amount of the claim."); *In re Shane Co.*, 464 B.R. 32, 43 (Bankr. D. Colo. 2012)

("the calculation of damages is a separate and distinct question from the cap on those damages")

(citing *In re USinternetworking, Inc.*, 291 B.R. 378, 380 (Bankr. D. Md. 2003)).  Although the

well settled view is to apply section 502(b)(6) to a lessor's claim against a debtor-guarantor, the

Landlord's argument that this Court should adopt the reasoning of *Danrik* and *Dronebarger* in

no way manifests an improper purpose of harassing or punishing the Debtor.  As such, summary

judgment to reduce the Amended Claim to zero and expunge it for bad faith is denied.

<u>Conclusion</u>

For the foregoing reasons, the Court grants in part and denies in part the Debtor's Motion

for Summary Judgment.  The Court will issue a separate order consistent with this memorandum

decision.



**Dated: March 2, 2016
        Poughkeepsie, New York**

/s/ **Cecelia G. Morris**

_____
**Hon. Cecelia G. Morris
Chief U.S. Bankruptcy Judge**