UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
In re:                                                         Chapter 11
STEVEN J. ANCONA,                                              Case No. 14-10532 (MKV)

              Debtor.
------------------------------------------------------x

# DEBTOR'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION OF
# 3 WEST 16th STREET LLC TO CONVERT CHAPTER 11 CASE TO CASE UNDER
# CHAPTER 7 OR, ALTERNATIVELY, TO APPOINT A CHAPTER 11 TRUSTEE

**PICK & ZABICKI LLP**
369 Lexington Avenue, 12th Floor
New York, New York 10017
(212) 695-6000
By:    Douglas J. Pick
       Eric C. Zabicki

*Counsel to the Debtor*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...............................................................    1

BACKGROUND ...............................................................................    3

    A.  Pre-Petition Real Property-Related Litigation ................................    3

    B.  The Debtor's Chapter 11 Filing ................................................    4

    C.  Claim Litigation in This Court ................................................    5

    D.  The Landlord's Filing of the Instant Motion ...............................    12

ARGUMENT ................................................................................. 

    A.  Conversion of the Debtor's Case to Chapter 7 is Not Warranted .....................    13

        1.  The Landlord Has Failed to Establish the Existence of
            "Cause" or Conversion of the Debtor's Chapter 11 Case
            to a Case Under Chapter 7 ................................................    14

            (i)  *The Landlord Has Not Demonstrated That the*
                *Debtor's Case Was Filed in Bad Faith* ...............................    15

            (ii)  *The Landlord Has Not Demonstrated*
                *Any Other Basis for "Cause"* ...............................    21

        2.  Even if "Cause" is Determined to Exist, the Debtor's
            Case Should Not Be Converted to Chapter 7 ...............................    24

    B.  The Appointment of a Chapter 11 Trustee is Not Warranted .............................    27

        1.  The Landlord Has Failed to Establish the Existence of
            "Cause" for the Appointment of a Chapter 11 Trustee
            Under § 1104(a)(1) of the Bankruptcy Code ...............................    27

        2.  The Landlord Has Failed to Establish That the Appointment of a
            Chapter 11 Trustee Would Be in the Best Interests of Creditors and
            All Interests of the Estate Under § 1104(a)(2) of the Bankruptcy Code ............    29

CONCLUSION ...............................................................................    31

## TABLE OF AUTHORITIES

**Federal Cases**                                                                                    **Page(s)**

*In re 1031 Exchange Group, LLC,*
    374 B.R. 78 (Bankr. 2007) ............................................................... 26, 27, 29

*In re Adamo,*
    No. 14-73640, 2016 Bankr. LEXIS 694 (Bankr. E.D.N.Y. Mar. 4, 2016) .......... 16 n. 14

*In re Adbrite Corp.,*
    290 B.R. 209 (Bankr. S.D.N.Y. 2003) ......................................................... 14

*In re Adelphia Communications Corp.,*
    336 B.R. 610 (Bankr. S.D.N.Y. 2006) ..................................................... 28-29

*In re Andover Togs, Inc.,*
    231 B.R. 521 (Bankr. S.D.N.Y. 1999) ..................................................... 9 n. 8

*In re C-TC 9th Avenue Partnership,*
    113 F.3d 1304 (2d Cir. 1997) ............................ 14, 15, 16 n. 14, 17, 18, 19, 23, 24

*In re Century/ML Cable Venture,*
    294 B.R. 9 (Bankr. S.D.N.Y. 2003) ......................................................... 23, 24

*In re Cohoes Indus. Terminal, Inc.,*
    65 B.R. 918 (Bankr. S.D.N.Y. 1986) ............................................................. 15

*In re Colorado-Ute Elec. Assoc., Inc.,*
    120 B.R. 164 (Bankr. D. Colo. 1990) ..................................................... 29 n. 25

*In re Court Living Corp.,*
    1996 U.S. Dist. LEXIS 13588 (S.D.N.Y. 1996) ................................................. 14

*In re Danrik, Ltd.,*
    92 B.R. 964 (Bankr. N.D. GA. 1988) ..................................................... 9 n. 8, 11

*In re Dronebarger,*
    No. 10-10889, 2011 Bankr. LEXIS 452 (Bankr. W.D. Tex. Jan. 31, 2011) ....... 9 n. 8, 11

*In re Euro-American Lodging Corp.,*
    365 B.R. 421 (Bankr. S.D.N.Y. 2007) ................................................. 27, 28, 30

*In re Federated Dep't Stores,*
    131 B.R. 808 (S.D. Ohio 1991) ................................................................. 11

*In re HBA East, Inc.,*
    87 B.R. 248 (Bankr. E.D.N.Y. 1988) ........................................................... 14

## TABLE OF AUTHORITIES (CONTINUED)

**Federal Cases**                                                                                          **Page(s)**

*In re Hampton Hotel Investors, L.P.*,
    270 B.R. 346 (Bankr. S.D.N.Y. 2001) ...................................................... 14, 26

*In re Ionosphere Clubs, Inc.*,
    113 B.R. 164 (Bankr. S.D.N.Y. 1990) ................................................. 27, 29, 30

*In re Liberate Technologies*,
    314 B.R. 206 (Bankr. N.D. Cal. 2004) ............................................. 18 n. 19, 21

*In re Love*,
    957 F.2d 1350 (7th Cir. 1992) ...................................................... 15-16

*In re Marvel Entertainment Group*,
    140 F.3d 463 (3d Cir. 1998) .......................................... 28, 28 n. 24, 29, 29 n. 25

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc.*
*(In re Integrated Telecom Express, Inc.)*,
    384 F.3d 108 (3d Cir. 2004) ............................................................. 20, 21

*In re North Star Contracting Corp.*,
    128 B.R. 66 (Bankr. S.D.N.Y. 1991) ....................................................... 29 n. 25

*Nostas Assocs. v.. Costich (In re Klein Sleep Products, Inc.)*,
    78 F.3d 18 (2d Cir. 1996) ....................................................................... 9 n. 8

*In re Picacho Hills Util. Co.*,
    518 B.R. 75 (Bankr. D.N.M. 2014) ..................................................... 25 n. 23

*Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*,
    314 F.3d 1070 (9th Cir. 2002) ......................................................................... 15

*Pleasant Pointe Apartments, Ltd. v. Kentucky House. Corp.*,
    139 B.R. 828 (W.D. Ky. 1992) .................................................................. 14

*In re Reichert*,
    138 B.R. 522 (Bankr. W.D. Mich. 1992) ..................................................... 14

*In re Roma Group, Inc.*,
    165 B.R. 779 (S.D.N.Y 1994) ...................................................................... 14

*In re Schur Mgmnt. Co.*,
    323 B.R. 123 (Bankr. S.D.N.Y. 2005) ..................................................... 18 n. 18

## TABLE OF AUTHORITIES (CONTINUED)

**Federal Cases**                                                                                    **Page(s)**

*In re Setzer,*
    47 B.R. 340 (Bankr. E.D.N.Y. 1985) ……………………………………………….. 15

*In re Sharon Steel Corp.,*
    871 F.2d 1217 (3d Cir. 1989) ……………………………………………… 27, 29

*In re Smart World Techs., LLC,*
    383 B.R. 869 (S.D.N.Y. 2008) …………………………………………………… 28

*In re Syndicom Corp.,*
    268 B.R. 26, 43 (Bankr. S.D.N.Y. 2001) …………………………………………… 26

*In re Tornheim,*
    181 B.R. 161 (Bankr. S.D.N.Y. 1995) …………………………………………… 14

*In re Tornheim,*
    239 B.R. 677 (Bankr. E.D.N.Y. 1999) …………………………………………… 15

*In re V. Savino Oil & Heating Co.,*
    99 B.R. 518 (Bankr. E.D.N.Y. 1989) ……………………………………........... 30

**Statutes and Rules**

11 U.S.C. § 502(b)(6) ……………………………………….. 6, 7, 9, 9 n. 8, 11, 20, 21

11 U.S.C. § 1104 …………………………………………………………. 1, 27

11 U.S.C. § 1104(a)(1) …………………………………………… 27, 28, 29, 29 n. 25

11 U.S.C. § 1104(a)(2) …………………………………………………… 28, 29, 30

11 U.S.C. § 1112(b) …………………………………………….. 1, 13, 14, 16, 24

11 U.S.C. § 1112(b)(1) ……………………………………………………… 13

11 U.S.C. § 1112(b)(2) …………………………………………………… 24, 25 n. 23

Fed. R. Bankr. P. 2004 …………………………………………… 5 n. 5, 16, 23

Fed. R. Bankr. P. 7001, *et seq.* ……………………………………………… 9 n. 7

## PRELIMINARY STATEMENT

Steven J. Ancona, the debtor and debtor-in-possession herein (the "Debtor"), by his undersigned counsel, respectfully submits this memorandum of law in opposition to the motion of 3 West 16th Street LLC (the "Landlord") for an Order: (a) pursuant to § 1112(b) of title 11 of the United States Code (the "Bankruptcy Code"), converting the Debtor's case under chapter 11 to a case under chapter 7 of the Bankruptcy Code; or, alternatively (b) pursuant to § 1104 of the Bankruptcy Code, appointing a chapter 11 trustee (the "Motion").

It is rather unfortunate that, at a crucial juncture in this case at which the Debtor and the Landlord should be devoting their time and efforts to finalizing discovery and scheduling a trial in connection with the fact-specific, complex issues associated with the $20,561,342 amended claim asserted against the Debtor by the Landlord (the "Amended Claim"), the Landlord has instead opted to distract the attention of the Debtor and this Court by filing the instant Motion. Indeed, the filing of the Motion is particularly unfortunate given the fact that the drastic and extraordinary relief sought by the Landlord is premised upon nothing more than the Landlord's distorted and conjecturous interpretation of certain long known pre and post-petition events which the Landlord now, more than two and a half years into the case, spews out in a disingenuous attempt to argue, through mere innuendo and surmise, that the Debtor's chapter case was filed in "bad faith" or that "cause" for conversion of the Debtor's case to chapter 7 or the appointment of a chapter 11 trustee is warranted. On its face, the Motion appears to have been filed as a mere litigation tactic on the part of the Landlord to try and take the pending objections to the Amended Claim out of the hands of the Debtor in the middle of trial preparation and place said objections under the control of a "friendlier" adversary.[1]

---

[1] In this regard, the Court should note that, despite the gravity of the relief sought therein and the potential devastating

1

Respectfully, and as discussed at length herein and in the accompanying declarations of the

Debtor (the "Ancona Decl.") and Douglas J. Pick (the "Pick Decl."), and the exhibits thereto, the

Motion is entirely without merit as the Landlord has failed to establish the existence of "cause" or

any other appropriate basis for either the conversion of the Debtor's case to chapter 7 or the

appointment of a chapter 11 trustee.[2]    Rather, the Motion presents nothing more than a continuing

unnecessary drain on the time, attention and resources of the Debtor, his professionals and this

Court, all of which would be better spent concentrating on completing all discovery and

proceeding with an evidentiary hearing on the merits of the Amended Claim and, thereafter, with

---

impact thereof upon the Debtor if granted (*e.g.*, the involuntary appointment of a trustee to take control and presumably liquidate the Debtor's assets which he spent a lifetime building, including his family's home), the Landlord initially scheduled, filed and served the Motion so as to provide the Debtor with the least amount of time possible to respond.  Specifically, the Landlord filed the Motion after 5:00 p.m. on Friday, August 26, 2016, with a hearing date only twenty (20) days later on September 15, 2016 despite the requirement in Rule 2002(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") that such a motion be made on not less than twenty-one (21) days' notice (plus 3 days for mailing if served by mail).  The Motion was also filed one (1) day after the Debtor's counsel had sent a proposed Scheduling Order to counsel to the Landlord for the purposes of establishing dates to conclude the remaining pre-trial matters with regard to the pending objection to the Amended Claim.  (*See* Pick Decl., Ex. E)  Under the Scheduling Order proposed by the Debtor, fact discovery would be completed by January 31, 2017 and expert discovery would be completed by April 20, 2017.  Such tactics (*e.g.*, filing a critical motion after the close of business on a Friday at the end of August on short notice) are typical of the "gamesmanship" and lack of cooperation exhibited by the Landlord throughout this case which, more than anything, is the reason that the Debtor's chapter 11 case is not further along.  Moreover, the Landlord's effort to replace the Debtor with a more compliant adversary with regard to claim objection is evident from the following statement made in Footnote 1 of its memorandum of law in support of the Motion:

> Assuming the Case is converted or a chapter 11 trustee is appointed, Debtor's recent retention of Wachtel Missry LLP ("Wachtel Missry") as special counsel will likely become unnecessary as the chapter 7 or chapter 11 trustee will likely want to retain his/her own counsel in connection with 3 West 16th Street's Amended Claim.

The Landlord pays no regard whatsoever to the additional layer of administrative expenses, not to mention the waste of efforts made in this case to date, that would come with the appointment of a chapter 7 or chapter 11 trustee.  Clearly the Landlord's hope is that a trustee will run roughshod over the Debtor's interests by immediately and forcibly liquidating all of the Debtor's assets (or, at a minimum, more assets than might otherwise need to be liquidated depending on the outcome of the claim litigation) prior to any determination being made by this Court as to the merits of the Amended Claim and will, thereafter, come to an agreement with the Landlord to divvy up the proceeds.

[2] The Landlord failed to submit any affidavit or declaration from anyone having personal knowledge of the matters alleged or the exhibits submitted in support of the Motion.  Nevertheless, to the extent that the Court may perceive any factual issues relevant to its determination of the Motion, the Debtor would respectfully request that an evidentiary hearing be held thereon so as to establish a full and complete record.  Relief of such drastic import should not be granted merely on papers filled with nothing more than innuendo and surmise.

the process of confirming a chapter 11 plan providing for treatment of any surviving portion of the Amended Claim and the other claims asserted against the Debtor. Accordingly, the Motion should be denied in its entirety.

## BACKGROUND

A. Pre-Petition Real Property-Related Litigation

On March 24, 2006, the Debtor executed a Guaranty by which the Debtor personally guaranteed 45% of the obligations of 3 West Development LLC (the "Tenant") under a thirty-five (35) year "net" lease (the "Lease") entered into with the Landlord for the building located at 3 West 16th Street in Manhattan (the "Building").[3] Ultimately, multiple disputes arose and, as a result thereof, the Landlord asserted various breach of contract claims against the Tenant based upon the alleged failure to: (a) pay rent and (b) complete certain pre-approved alterations to the Building. In order to protect its rights, the Tenant (along with the synagogues that occupied a portion of the Building) commenced an action against the Landlord titled *Magen David of Union Square, The Sixteenth Street Synagogue, and 3 West Development, LLC v. 3 West 16th Street, LLC,* Index No. 600573/2008 (the "State Court Action"). The Landlord subsequently commenced a third-party action titled *3 West 16th Street, LLC v. Steve Ancona,* as part of the State Court Action seeking to enforce the Guaranty as against the Debtor.

By order dated January 11, 2010, the Supreme Court granted the Landlord's motion for summary judgment and held that the Landlord had a fee simple interest in the Building, that the Tenant did not possess any equitable ownership interest in the Building, and that the Tenant's leasehold interest was terminated on June 7, 2008 and, thus, the Landlord was entitled to

---

[3] Additional facts are set forth in the accompanying Ancona Decl. and the declaration of Douglas J. Pick. Rather than repeating those facts at length herein, the Debtor respectfully refers the Court to the Ancona Decl., the Pick Decl., and the exhibits attached thereto, for a complete recitation of the relevant facts.

3

possession.  The Supreme Court also granted summary judgment on the Landlord's third-party complaint against the Debtor, a decision which was subsequently affirmed on appeal by decision dated September 29, 2011.  No inquest concerning the Landlord's damages as against the Debtor was yet held nor was any determination thereof made by the Supreme Court.

On April 10, 2013, the Landlord commenced a separate action against the Debtor (among others) titled *3 West 16th Street, LLC v. Steven Ancona, 31 Bethune Street LLC and 20 Warren Street LLC,* Index No. 153301/13 (the "Fraudulent Conveyance Action"), seeking to avoid certain transfers of real property in which the Debtor had an interest as alleged fraudulent conveyances pursuant to New York Debtor and Creditor Law, Article 10, §§270 *et seq.*, or alternatively seeking an attachment of certain assets of the defendants therein.  Simultaneously, 3 West 16th Street filed Notices of Pendency with regard to the real property at issue.

B.  The Debtor's Chapter 11 Filing

The fees and costs of addressing the multiple litigations with the Landlord over the course of many years, including the appeal, were massive and had caused financial strain on the Debtor. The Debtor concluded that, in order to fund the additional massive legal fees associated with litigating the complex "damage phase" of the State Court Action, he would need to immediately sell off of certain of his assets at "fire sale" prices and/or borrow large amounts of cash on unfavorable terms and secured by his assets.  Attending to the multiple litigations were also taking a toll on the Debtor's ability to concentrate on his business and to produce income for his family. Additionally, given the amounts that might be adjudged to be owed by him to the Landlord, coupled with his other debt obligations (including as a guarantor of multiple mortgage notes), the Debtor either was or was in danger of becoming insolvent.[4]

---

[4] Indeed, in the Fraudulent Conveyance Action, the Landlord had affirmatively alleged that the Debtor was insolvent.

4

The Debtor consulted with his litigation and bankruptcy counsel upon which it was determined that, absent a settlement with the Landlord, it would be in the Debtor's best interests and those of all of his creditors to seek relief under chapter 11 of the Bankruptcy Code so as to preserve the value of the Debtor's asset portfolio for the benefit of all creditors while permitting the Debtor to "regroup" so as to effectively challenge the complex damage amounts sought by the Landlord and formulate a comprehensive plan to address all of my financial affairs. Accordingly, on March 5, 2014 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code with this Court.[5]

C. Claim Litigation in This Court

On April 29, 2014, the Landlord's initial proof of claim was filed in the Debtor's chapter 11 case asserting an indebtedness in the amount of $6,831,929.46 in connection with the Debtor's personal Guaranty of the Tenant's obligations under the Lease (the "Initial Claim").[6] The amounts asserted by way of the Initial Claim were broken down by the Landlord into "pre-eviction" and "post-eviction" categories and included such alleged outlays made, and alleged damages incurred, by the Landlord as real property taxes totaling $596,607.75 and interest thereon

---

(*See* Exhibit "H" to the Motion at p. 2)

[5] As more fully set forth in the Ancona Decl., over the course of the months immediately following his chapter 11 filing, and in keeping with his obligation to disclose and explain his assets, liabilities and other financial affairs in this proceeding, the Debtor has produced an enormous amount of documents and information in response to requests made by the Landlord (in connection with its expansive discovery campaign under Bankruptcy Rule 2004 commenced with the filing of its application for such discovery on May 28, 2014) and the United States Trustee concerning the Debtor and numerous corporate entities in which the Debtor holds direct or indirect interests. Moreover, on November 3, 2014, the Debtor was examined by counsel to the Landlord pursuant to Bankruptcy Rule 2004. The examination was attended by four attorneys on behalf of the Landlord and Mr. Braha. It was, simply said, an attempted show of force.

[6] The Court should note that the Landlord's principal, Jack Braha, had previously submitted: (a) an affidavit sworn to on January 27, 2011 in the State Court Action in support of the Landlord's motion for partial summary judgment setting forth the extent of the Landlord's alleged damages against the Debtor as $1,398,093.06 plus unpaid rent of $37,977 per month from January 2011 until judgment was entered (*see* Pick Decl., Ex. H, at ¶¶40 and 14); and (b) a second affidavit sworn to by Mr. Braha on dated July 18, 2013 in the Fraudulent Conveyance Action wherein the Landlord's damage claim was increased to "approximately $3,650,000, plus interest at 9% from the due dates, and 100% of attorneys' fees for enforcement of Ancona's guaranty. The total due from Ancona to 3 West is a minimum of $4,000,000 as of April 8, 2013." *See* Pick Decl., Ex. I, at ¶¶ 9 and 10.

totaling $113,957.00, insurance payments totaling $7,925.82, attorneys' fees and disbursements through eviction totaling $865,000.00, attorneys' fees not otherwise included in the other amounts claimed totaling $118,270.46, "Further damages due prior to eviction for failure to timely complete renovation per lease as required" totaling $2,500,000.00, alleged damages "From February 1, 2013 to February 15, 2015 (Building empty, no income expected)" totaling $2,304,475.12; and "Projected Deficiency Damages after February 1, 2015" (*i.e.,* the Landlord's estimate of the alleged "Shortfall of Income" against the rent reserved over the life of the Lease through the expiration of its term in 2020) of $2,473,899.00. With the exception of excerpts of the Lease and Guaranty, the Appellate Division decision affirming the award of summary judgment on liability as against the Debtor in the State Court Action, and internally prepared summaries and calculations of the amounts claimed, no supporting documentation was attached to the Initial Claim such as to support the specific amounts claimed by the Landlord against the Debtor for either the "pre-eviction" period (*e.g.,* proof of property taxes or interest thereon paid, invoices and time records for alleged attorneys' fees, and the like) or the "post-eviction" period (*e.g.,* projected future damages).

On June 24, 2014, and for the purposes of liquidating the Initial Claim in furtherance of providing for treatment of any resulting, liquidated claim under a chapter 11 plan, the Debtor filed an objection to the Initial Claim. Over the course of the ensuing months, and for the purposes of narrowing the issues to be litigated/adjudicated, the Debtor repeatedly demanded that the Landlord amend the Initial Claim as it was excessive on its face in that, among other things, it failed to reflect the statutory cap on the Landlord's breach of lease damages pursuant to § 502(b)(6) of the Bankruptcy Code and further failed to account (by way of offset) for the rents which the Landlord had and will receive from new tenants of the Building that was the subject of the Lease. The

6

Landlord simply refused.

Literally unable to amicably resolve even the simplest of issues relating to the Initial Claim with the Landlord, the Debtor and his counsel concluded that a motion for summary judgment should be brought which would have the effect of, at a minimum, narrowing the legal issues, expediting what might otherwise be extensive and unnecessary fact and expert discovery, and minimizing costs to the Debtor's estate.  A pre-motion conference was subsequently held on June 16, 2015 at the Debtor's request at which the Debtor's counsel addressed the inability to reach any common ground with the Landlord and requested permission to seek summary judgment on various legal issues affecting the merits of the Amended Claim.  In this regard, the Debtor's former special counsel (Howard Kingsley, Esq.) stated as follows at the pre-motion conference:

> ...And that's the reason why we want to move for summary judgment because we think it will be extremely efficient.  For instance, one of the issues that has taken up a tremendous amount of discovery and will continue take up a tremendous amount of time in discovery and certainly a very lengthy trial is the question as to whether or not the debtor is liable for these construction damages.

> Under the lease, the tenant was required to perform a certain build out.  The lease was then terminated.  The landlord has now engaged in construction, most of which I think is (sic) believe, is after the petition date I believe, but in any event, continued the construction process.  And the construction that it did is much different than what the tenant was supposed to do.

> We believe, as a matter of law, that the construction damages are not an allowed claim under 502(b)(6).  So if we get a legal determination as to whether or not that construction claim is allowable or not, and we think it's not, then that will save a lot of time and energy of all parties, including the Court, in dealing with that issue at trial.  That claim at (sic) the initial proof of claim was 2.5 million and it continues to increase.

> In addition, Your Honor, the claim of base rent.  The base rent claim is based upon a formula, as Your Honor knows, that improperly included certain amounts.  From our calculation at the very least it's got to be reduced by 10,000 a month.  It's going to be based upon outlays.  What outlays they make, the numbers will show what they are.  But the manner in which they did it, interest cannot be included and they refuse to acknowledge the clear terms of the lease and that's why we haven't been able to resolve some of the issues.

7

There's also a legal issue, Your Honor, as to whether or not the guarantor is liable for rent for certain amounts due prepetition as it relates to rent or use and occupancy.

The guarantor only guaranteed those obligations of the tenant under the lease. The appellate division has held that once the lease was terminated – and there's no dispute that the lease was terminated in June of 2008 – the appellate division said since that time, use and occupancy is due. As a matter of law use and occupancy is not rent and the debtor did not agree in his guaranty, which has to be strictly construed as a matter of law, to pay use and occupancy. That is a legal issue which the court can decide and knock out a tremendous amount of the claim.

In addition with respect to the cap, they haven't applied the cap. They still haven't applied the cap. You asked them almost a year ago to amend their claim. They still haven't done that. So they're continuing to increase the amount of their claim. Their claim was filed almost a year ago. So those two components, Your Honor, are the major components to that claim which we think can be decided on summary judgment.

There's also legal issues as to whether or not they are entitled to real estate taxes and insurance after the termination of the lease. The lese says that once the lease terminates, the tenant has no obligation for it. It's a legal issue.

If we lose under the legal issue, then it's just a matter of the numbers. I think we'll save a lot of time even on the back end, even if there's some legal, excuse me, even if the Court finds that we may not be correct on certain issues. So that's why we're here, Your Honor. We want to try and avoid the trouble of many depositions dealing with all the people in the construction process, the construction managers, the architects, the subcontractors, the contractors, the different people that were involved in dealing with this different build out and to show that there's a difference of the work that has been done and that has not been done.

Your Honor, there's also a very serious aspect that we see and that is the debtor has learned through discovery, that the landlord has fully rented the building. The amount that it's receiving in rent now is more than the tenant was required to pay. They have not applied those amounts to their claim and they haven't reduced their claim.

Also, the building is up to $30 million. When they bought it, it was $5 million. So they have a tremendous windfall on that too. And there's a question, we think a legal question, as to whether or not they have even suffered any actual damages.

So the point of us writing the motion, Your Honor, is to try and get this case over now. It's been going on long enough and we sincerely believe that we can do that on summary judgment and we believe summary judgment is appropriate.

Pick Decl., Ex. F (June 16, 2015 Court Transcript), pp. 9-12)

After hearing from both sides, Judge Gerber permitted the Debtor to seek summary judgment and further directed that the Landlord amend the Initial Claim so that the Debtor was not put in the unenviable position of "attacking a moving target". *See* June 16, 2015 Transcript at p. 20.[7] The Debtor and his professionals presumed that the Landlord's amended claim would be more carefully crafted so as to reduce/minimize the "legal issues" that the Debtor would address in his summary judgment motion and, thus, make a trial on the proof of claim more efficient and more productive. Unfortunately, that did not happen. Rather, on July 10, 2015 the Landlord filed the Amended Claim more than tripling the amount asserted to $20,561,342, ignoring the § 502(b)(6) cap[8], failing to offset rents received/to be received from new tenants, and asserting calculations different from those stated in its sworn responses to the Debtor's interrogatories and from those that the Landlord had been asserting continuously for more than seven (7) years and which the Debtor had been relying on for over a year in objecting to the Initial Claim.

---

[7] In this regard, Judge Gerber directed that the amended claim that the Landlord was directed to file be treated as a complaint and that Part VII of the Bankruptcy Rules would apply to the claim objection. (*See* Pick Decl., Ex. F (June 16, 2015 Court Transcript), p. 21) As the date for trial on the Amended Claim filed at Judge Gerber's direction approaches, it appears that the Motion, on its face, is a litigation tactic by the Landlord to circumvent and/or delay a determination on the merits of the Amended Claim.

[8] The Landlord would later attempt to argue that its refusal to apply the § 502(b)(6) cap was premised on its belief, contrary to what the Landlord had alleged in the Fraudulent Conveyance Action, that the Debtor was solvent which precluded the application of the cap. Specifically, Footnote 3 to the Landlord's memorandum of law in opposition to the Summary Judgment Motion provided as follows:

> As Debtor admits, the Statutory Cap "is designed to prevent a landlord's single unsecured claim...to elbow aside the unsecured creditors." *See* Debtor's MOL, p.8 (quoting *Nostas Assocs. v. Costich (In re Klein Sleep Products, Inc.), 78 F.3d 18, 28 (2d Cir. 1996)); see also In re Andover Togs, Inc.,* 231 B.R. 521, 549 (Bankr. S.D.N.Y. 1999) (noting that Statutory Cap is "intended to give a fair remedy to both the debtor and the landlord, taking into account the fact that the landlord retains the property at the end of the lease while ensuring that the landlord does not get the lions' share of the estate to the detriments of the estate's creditors"). Assuming the Court determines – after adequate discovery or other disclosure – that there is little or no risk of full, uncapped recovery by Landlord detrimentally impacting other, legitimate, unsecured creditors, the Statutory Cap should not be applied to the Amended Claim. *See [In re] Danrik, [Ltd.,]* 92 B.R. [964] at 971-72 [Bankr. N.D. Ga. 1988]; *[In re] Dronebarger,* 2011 WL 350479, at *20 [Bankr. W.D. Tex. Jan. 31, 2011].

On September 4, 2015, and still being literally unable to amicably resolve any issues (no matter how minor) as to the elements of the now Amended Claim with the Landlord, the Debtor filed his summary judgment motion (the "Summary Judgment Motion"). By way of the Summary Judgment, and again for the purposes of narrowing the issues, simplifying discovery, minimizing expenses, and expediting trial, the Debtor sought determinations as to the following legal issues:

- Does the statutory cap apply to a debtor that personally guaranteed a non-residential lease?

- Did the Landlord improperly inflate the monthly amount of Base Rent by including amounts in the computation that were not authorized by the terms of the Lease?

- Can the Landlord hold the Debtor liable for the Tenant's "use and occupancy" under the Guaranty?

- Is the Landlord entitled to recover real estate taxes and insurance charges under the Lease after the Lease was terminated?

- Is the Landlord entitled to late fees?

- Is the Landlord entitled to attorneys' fees?

- Is the Landlord required to reduce its damages by all rents it has received and will receive in the future?

- Has the Landlord suffered any actual damages?[9]

- Should the Amended Claim be reduced to zero and expunged because, *inter alia*, it was filed in bad faith?

By decision dated March 2, 2016, the Court granted, in part, and denied, in part, the Summary Judgment Motion.[10] In so-holding, Chief Judge Cecelia G. Morris stated, in relevant

---

[9] It is not disputed that the Landlord had listed the building for sale for $33,000,000.

[10] The Summary Judgment Motion was fully briefed as of October 26, 2015. However, in light of his impending retirement, Judge Gerber held the Summary Judgment Motion in suspense for several months until it was subsequently decided by Chief Judge Morris. The Landlord fails to take this delay, which was not of the Debtor's making, into account with regard to its arguments that the Debtor's chapter 11 case is purportedly not progressing. Similarly, the

10

part, as follows:

> Conceding the existence of this majority view [concerning the application of the §502(b)(6) cap in cases where the debtor was a guarantor of a lease rather than a party to the lease itself], the Landlord nonetheless argues that the statutory cap does not apply to its claim against the Debtor under the Guaranty and urges this Court to adopt the reasoning in *In re Danrik, Ltd.*, 92 B.R. 964 (Bankr. N.D. GA. 1988) and *In re Dronebarger*, No. 10-10889, 2011 Bankr. LEXIS 452, 2011 WL 350479, at 20 (Bankr. W.D. Tex. Jan. 31, 2011). The Court is not persuaded.

*    *    *

> The Landlord further argues that the Court cannot determine the applicability of the section 502(b)(6) cap without first determining the Debtor's solvency and whether the Debtor's other claims are legitimate and will be fully paid, because such equitable factors "potentially preclude application of the statutory cap to Landlord's Amended Claim." Landlord's Opp. At 5-7. The Landlord is mistaken.

*    *    *

> Notwithstanding the fact that this Court does not (and need not) adopt the rationale in *Danrik* or *Dronebarger* as discussed above, neither case stands for the proposition that a court must first find a debtor to be insolvent or determine all other claims against a debtor before analyzing a claim under section 502(b)(6). To do so would effectively rewrite the statute to include a prerequisite or exception to section 502(b)(6)'s applicability where none exists, and lead to the absurd result where landlord-creditors' claims against a debtor cannot be ascertained until after a plan has been filed. In fact, at least one court has found that a debtor's solvency does not affect the applicability of the damages cap under section 502(b)(6). *See In re Federated Dep't Stores*, 131 B.R. 808, 817 (S.D. Ohio 1991). In *Federated*, the lessor creditor argued that the cap should not apply due to the fact that the claims of debtors' other creditors can be satisfied even if the lessor's claim was allowed in full. *Id* at 816. In rejecting the lessor's argument, the *Federated* court explained:

>> There is simply nothing in the plain language of § 502(b)(6) to suggest that a bankruptcy court may depart from the application of the cap on a lessor's claim any time the debtor is solvent or the court otherwise believes the equities of the case might warrant such a departure.[11]

---

lead attorney for the Landlord has changed not less than 4 times during the course of this case which would result in delays each time (*i.e.* any progress that was being made was lost time and time again). The Landlord similarly fails to recognize or discuss these delays which it caused.

[11] On March 16, 2016, the Debtor filed a motion seeking reargument on certain limited issues raised in the Summary Judgment Motion that the Debtor had believed the Court had overlooked relating to the Landlord's purported

The Landlord continues to refuse the Debtor's overtures that the Landlord further amend its claim so as to be in conformity with the Court's holdings.[12]

D. The Landlord's Filing of the Instant Motion

Subsequent to the Court's decision on the Summary Judgment Motion, a series of interim fee applications and motions seeking approval of third-party payment of the Debtor's professionals were filed and were objected to by the Landlord. Ultimately, the Debtor's special litigation counsel heading up the Debtor's objection to the Amended Claim sought (and was subsequently granted on June 15, 2016) leave to withdraw because of the inability to obtain an approved mechanism to pay special counsel's accrued and accruing professional fees. On August 10, 2016, an Order was entered authorizing the Debtor's retention of substitute special counsel (*i.e.*, Wachtel Missry) to litigate the remaining issues concerning the Amended Claim through trial.

With substitute special counsel now on board, a proposed Scheduling Order was provided to counsel to the Landlord on August 25, 2016 for the purposes of establishing dates to conclude the remaining pre-trial matters and scheduling a trial on the Amended Claim (which presumably was Judge Gerber's and Chief Judge Morris' expectation of where the matter was heading). However, on August 26, 2016, and without responding to the Debtor's proposed Scheduling

---

entitlement to recover late fees, construction costs, and attorneys' fees. Said motion was denied by the Court predominantly on the basis that a more developed factual record was needed in order to determine the multiple ambiguities determined to exist in connection with the Lease and the Guaranty.

[12] Strangely, notwithstanding, among other things, the ambiguities under the Lease noted by Chief Judge Morris, many of which were also acknowledged by the Landlord in opposition to the Summary Judgment Motion, the Landlord portrays itself in the Motion as holding a liquidated, undisputed claim against the Debtor for more than $20 million when nothing could be further from the truth. The Debtor had suggested (as did the United States Trustee) the possibility of entering into mediation with the Landlord to simply see whether any disputes relating to any of the components of the Amended Claim could be amicably resolved (*e.g.*, construction costs, base rent calculations, etc...) but even that proposal was rejected by the Landlord.

12

Order, the Landlord filed the instant Motion by which it seeks the conversion of the Debtor's

chapter 11 case to one under chapter 7 or, alternatively, the appointment of a chapter 11 trustee.

The Landlord has since refused to address the Scheduling Order until after the Motion is decided.[13]

## ARGUMENT

### A. Conversion of the Debtor's Case to Chapter 7 is Not Warranted

Respectfully, the Landlord has failed to establish that conversion of the Debtor's chapter

11 case to a case under chapter 7 is warranted.  In this regard, § 1112(b)(1) of the Bankruptcy

Code provides, in relevant part:

> (b)(1) Except as provided in paragraph (2) and subsection (c), on request of a party
> in interest, and after notice and a hearing, the court shall convert a case under this
> chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is
> in the best interests of creditors and the estate, for cause unless the court determines
> that the appointment under section 1104(a) of a trustee or an examiner is in the best
> interests of creditors and the estate.

Section 1112(b) of the Bankruptcy Code requires the court to conduct the following

two-part analysis in determining whether to convert or dismiss a chapter 11 case: first, as a

threshold matter, the court must determine whether cause for conversion or dismissal exists; and

second, if cause is found, the court must then decide whether it is in the best interests of creditors to

---

[13] The lack of any meritorious argument in support of the Motion is consistent with the Landlord's apparent strategy in this case of always simply "objecting for objection's sake" and its consistent refusal to give any serious consideration to amicably resolving any discovery disputes and its consistent refusal to simply move the matter forward for trial. The Landlord has filed objections in no particular order to the Debtor's applications seeking: (a) to extend his exclusive periods to file a plan and to solicit acceptances with regard thereto; (b) to retain special litigation counsel of his choosing with regard to the Landlord's claims; (c) to assume and assign a certain motor vehicle lease agreement; (d) to award interim professional fees; (e) to authorize third-party payments of interim professional fees; and (f) to cancel a notice of pendency.  The Landlord appears to also be alleging that a basis for the conversion of the case or the appointment of a chapter 11 trustee is the Debtor having brought "unsuccessful" motions or having failed to "substantially prevail" on motions seeking: (a) for summary judgment on its objection to the Amended Claim (See ¶29 to the Motion); (b) for reargument of certain portions of the Summary Judgment Motion (See ¶30 in the Motion); (c) the aforementioned motions to cancel a notice of pendency (See ¶31 to the Motion), to award interim professional fees and to authorize third-party payments of interim professional fees funds (See ¶32 of the Motion).  This "scorecard" approach adopted by the Landlord does not present any meritorious basis for the relief sought by way of the Motion, but does seem to have emboldened the Landlord to take a "knockout swing" at the Debtor by bringing the instant Motion.  Otherwise, why would the Landlord not simply move forward to trial with regard to the merits of the Amended Claim?

simply dismiss the case or to convert it to a chapter 7 case. *In re Hampton Hotel Investors, L.P.*, 270 B.R. 346, 358-59 (Bankr. S.D.N.Y. 2001).

      1.  The Landlord Has Failed to Establish the Existence of "Cause"
           for Conversion of the Debtor's Chapter 11 Case to a Case Under Chapter 7

It is well settled that a finding of "cause" for conversion or dismissal is not limited to the grounds enumerated in the Bankruptcy Code and the inquiry into what might constitute cause is a matter of judicial discretion to be determined on a case by case basis. *In re C-TC 9th Avenue Partnership*, 113 F.3d 1304, 1311 (2d Cir. 1997); *In re Adbrite Corp.*, 290 B.R. 209, 216 (Bankr. S.D.N.Y. 2003); *In re Court Living Corp.*, 1996 U.S. Dist. LEXIS 13588, * 9 (S.D.N.Y. 1996). A bankruptcy judge has a tremendous amount of discretion upon engaging in its determination of whether the requisite cause exists to convert or dismiss a chapter 11 case. *In re Roma Group, Inc.*, 165 B.R. 779, 781 (S.D.N.Y 1994); *In re Reichert*, 138 B.R. 522 (Bankr. W.D. Mich. 1992). In keeping with the same, the Court in *In re HBA East, Inc.*, 87 B.R. 248 (Bankr. E.D.N.Y. 1988), stated:

> [T]he precise perimeters of 'cause' are intentionally omitted from the statute so as to afford maximum flexibility and, among other things, to enable a bankruptcy court to dismiss a Chapter 11 case for any reason cognizable to the equity power and conscience of the court as constituting an abuse of the bankruptcy reorganization process.

87 B.R. at 258. The bankruptcy court can consider other factors that may arise in a given case and use its equitable powers to reach a proper result. *In re Tornheim*, 181 B.R. 161, 163 (Bankr. S.D.N.Y. 1995) (citations omitted). The party seeking conversion pursuant to § 1112(b) of the Bankruptcy Code bears the burden of demonstrating the existence of "cause". *Id.* at 163-64.

14

(i)    *The Landlord Has Not Demonstrated That the Debtor's Case Was Filed in Bad Faith*

The Landlord's primary contention for the existence of "cause" to convert the Debtor's case to chapter 7 is that the Debtor's chapter 11 petition was filed in "bad faith". It is well-settled that, in considering whether "cause" for conversion or dismissal exists, courts may consider whether the debtor's resort to the bankruptcy code was done in "bad faith." *See, e.g. In re Setzer*, 47 B.R. 340, 344 (Bankr. E.D.N.Y. 1985). In doing so, courts consider the "totality of the circumstances", including the presence or absence of numerous factors which are indicative of "bad faith". *See, e.g., In re Tornheim*, 239 B.R. 677, 686 (Bankr. E.D.N.Y. 1999). The bankruptcy court may inquire, based upon the totality of circumstances, as to the "ability and motivation" of the debtor in a chapter 11 case to "proceed promptly with an efficient and responsible liquidation". *In re Cohoes Indus. Terminal, Inc.*, 65 B.R. 918, 924 (Bankr. S.D.N.Y. 1986).

Among the factors considered in the "bad faith" analysis are whether: (1) the debtor has only one asset; (2) there are few unsecured creditors whose claims are small in relation to those of secured creditors; (3) the debtor's sole asset is the subject of a foreclosure action as a result of arrearages or default on debt; (4) the debtor's financial condition is, in essence, a two-party dispute between the debtor and secured creditors which can be resolved in a pending state court action; (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; (6) the debtor has little or no cash flow; (7) the debtor cannot meet current expenses including the payment of personal property and real estate taxes; and (8) the debtor has no employees. *C-TC 9th Avenue*, 113 F.3d at 1311 (*citing Pleasant Pointe Apartments, Ltd. v. Kentucky House. Corp.*, 139 B.R. 828, 832 (W.D. Ky. 1992)). At its core, the "good faith analysis must determine whether the filing is fundamentally fair to creditors

and, more generally, is the filing fundamentally fair in a manner that complies with the spirit of the Bankruptcy Code's provisions." *In re Love*, 957 F.2d 1350, 1357 (7th Cir. 1992).

Turning to the instant case, it is respectfully submitted that the Landlord has failed to establish that the Debtor's chapter 11 petition was filed in "bad faith". At the outset, it should not be disputed that the overwhelming majority of motions for relief under § 1112(b) based on allegations of a bad faith bankruptcy filing are raised at the inception or, at a minimum, in the early stages of the case. This is logical given the fact that, if a petition was not filed in good faith, the bankruptcy case should not be permitted to proceed as a threshold matter.[14] Here, over the course of more than the past two and half years, the Landlord has not only availed itself of the rights and privileges afforded to creditors of a bankruptcy estate (*e.g.*, obtaining extensive discovery under Bankruptcy Rule 2004) and having actively participated in the bankruptcy process (*e.g.*, filing proofs of claim, litigating the issues concerning the Amended Claim before this Court without objection, entering into several stipulations extending the Debtor's exclusive periods to file and confirm a plan, etc...) but has also never previously filed any motion seeking to dismiss or convert the Debtor's case on any basis, any motion to appoint a chapter 11 trustee, any motion seeking relief from the automatic stay so as to continue to litigate the State Court Action and/or the Fraudulent Conveyance Action, nor any other motion or application to take the matters at issue out of this Court. As such, it is rather disingenuous for the Landlord to come in at this late stage of the case and allege that the Debtor's chapter 11 filing more than two and half years ago was in bad

---

[14] It also should not be disputed that dismissal, rather than conversion, is the relief generally sought and/or granted in connection with allegations of a "bad faith" filing. *See, e.g., In re Adamo*, No. 14-73640, 2016 Bankr. LEXIS 694, *52 n. 23 (Bankr. E.D.N.Y. Mar. 4, 2016) ("The Court notes that the Motion seeks conversion of this case, not dismissal. Dismissal is generally the remedy sought for a bad faith filing as the allegation centers on the very filing itself, *i.e.*, that the chapter 11 petition was improper in the first instance.") (*citing C-TC 9th Ave.*, 113 F. 3d at 1310) Indeed, all of the cases cited by the Landlord involving questions of "bad faith" involved requests for dismissal rather than conversion. This is logical as the just "penalty" for seeking relief under the Bankruptcy Code in bad faith is the denial of the benefits thereof through dismissal of the case and not the forced liquidation/ruination of the putative debtor under chapter 7.

faith.

Nevertheless, the Landlord's attempt to demonstrate that certain of the *C-TC 9th Ave.* bad

faith factors are present in this case is without merit.[15]   The Landlord's allegations in this regard,

and the Debtor's responses thereto, can be summarily addressed as follows:

(1)    "Debtor has no real creditors, either secured or unsecured, except for 'insiders' and

3 West 16th Street and, thus, the issue of Debtor's financial condition is, in essence, a two-party

dispute between the Debtor and 3 West 16th Street." (*See* Motion at ¶¶64(i) and 66)[16]

- The Landlord's statement that the Debtor has no "real" non-insider creditors other than the Landlord is pure hyperbole.  Contrary thereto, and as discussed in the Ancona Decl., proofs of claim filed in the Debtor's case by such "non-insider" creditors as American Express Bank, FSB (Claims Nos. 2 and 4), American Express Centurion Bank (Claim No. 5), Toyota Motor Credit Corp. (Claim No. 1 regarding obligations under a motor vehicle lease), the Internal Revenue Service (Claim No. 3 on account of alleged personal tax obligations), NYC OATH (Claim No. 6 regarding violations against the Bethune Property), The Bank of New York Mellon (Claim No. 8 regarding obligations under a 2005 mortgage on certain real property in Long Branch, New Jersey in which the Debtor and his wife owns a 50% interest with his brother Robert Ancona) and Dime Savings of Williamsburg (Claim No. 13 regarding the obligations under a 2003 mortgage on the Bethune Property).[17]  (*See* Pick Decl., Ex. C) The Debtor's schedules also list many claims owed by the Debtor on account of such matters as legal services, accounting services, personal loans, guarantees, and the like. (*See* Pick Decl., Ex. B) The Landlord either completely ignores these claims or attempts to improperly dismiss them out of hand as not "real".   The Landlord goes one step further by attempting to compare its grossly overinflated, unliquidated, and disputed $20,561,342 Amended Claim to the legitimate, liquidated, and undisputed claims in an effort to show that this case is a two-party dispute.   Such a comparison is not relevant given the disputed and unliquidated nature of the Amended Claim.

---

[15] Respectfully, the only "bad faith" evidenced in this case to date has been the Landlord's adamant refusal to so much as meaningfully discuss the merits of the multiple elements of the Amended Claim or to voluntarily conform the Amended Claim to this Court's rulings, all of which have served to unnecessarily "run up" administrative expenses and delay an adjudication on the Debtor's objection to the Amended Claim and the filing of a chapter 11 plan providing for treatment of any surviving portion thereof.

[16] The Landlord made this exact argument in opposition to the Summary Judgment Motion and presumably reiterates same herein given the "new audience". *See* Footnote 2 to the Landlord's memorandum of law in opposition to the Summary Judgment Motion.

[17] The Debtor is the guarantor of the Promissory Note and Mortgage on 20 Warren Street LLC and is only on the Promissory Note for 31 Bethune Street, LLC.

Additionally, it should not be disputed that the impetus for most bankruptcy filings was a dispute with a single creditor, yet there is often no dispute that the case was filed in good faith. Additionally, any claim held by the Landlord is unsecured and, thus, this is unlike the situation contemplated under *C-TC 9th Avenue* where the debtor only filed as a last resort to avoid foreclosure by a secured creditor. Put simply, this case does not merely involve a two-party dispute between the Landlord and the Debtor.

(2)    "[T]he timing of Debtor's bankruptcy filing evidences an intent to delay or frustrate

3 West 16th Street's rights, including, without limitation, its rights to collect damages and/or

pursue its other remedies in both the State Court Action and the Fraudulent Conveyance Action."

(*See* Motion at ¶¶64(ii) and 65)

- As discussed at length above and in the Ancona Decl., the Debtor's decision to file for protection under the Bankruptcy Code was premised on such legitimate factors as the financial stress placed upon the Debtor as a result of the multiple litigations with the Landlord (including the drain on the Debtor's time caused by the litigations which impeded the Debtor's ability to conduct his business), the need to liquidate assets and/or borrow monies (perhaps needing to be encumbered by liens on the Debtor's assets) on forced terms to fund the protection of his interests in the ongoing litigations, the insolvency or danger of insolvency, the need to regroup so as to effectively address the damages sought by the Landlord, and to provide the time needed to prepare and orderly and comprehensive plan. Of course the Debtor was also concerned with the multiple possible adverse effects that the entry of a multi-million dollar judgment against him would have had upon him personally, as well as his ability to operate his business (*e.g.*, to obtain credit), not the least of which was the fact that he did not have ability to pay any such judgment absent a liquidation of all or substantially all of his assets. Again, it is not uncommon for one major concern among many lesser concerns to force a debtor into bankruptcy.[18] Additionally, the Debtor did not file his chapter 11 petition as a tactic in his litigation with the Landlord, but rather to address the many immediate, legitimate concerns described herein. The Debtor's filing is consistent the Bankruptcy Code's theme and goal of avoiding economic dismemberment and preserving ongoing values in assets owned by a debtor for the purpose of rehabilitation and reorganization.[19]

---

[18] The Landlord's reliance upon *In re Schur Mgmnt. Co.*, 323 B.R. 123 (Bankr. S.D.N.Y. 2005), concerning the timing of the Debtor's chapter 11 filing is misplaced. Unlike the debtor in *Schur*, the Debtor herein had an immediate need for bankruptcy protection other than merely staying the state court litigations given, among other things, the financial stresses placed upon the Debtor as a result of the endless litigations with the Landlord, the need to liquidate assets and/or borrow funds on forced terms in order to protect the Debtor's interests, the Debtor's actual/potential insolvency, and the like. Put differently, the Debtor did not file merely because a potential adverse judgment was looming.

[19] "Where the debtor is insolvent, a petition will almost invariably by consistent with the objectives of the bankruptcy laws" and, thus, such a petition is not filed in bad faith. *In re Liberate Technologies*, 314 B.R. 206 (Bankr. N.D. Cal. 2004)

(3)    "[B]ased upon the Debtor's MORs, there is little-to-no cash flow." (*See* Motion at ¶64(iii))

- As more fully discussed in the Ancona Decl., the Debtor earns a "steady but modest monthly" income, along with more "sporadic" amounts that may accompany a particular transaction or event. However, considerations of the Debtor's cash flow are largely irrelevant given the fact that the Landlord alleges that the Debtor owns assets having a liquidation value of in excess of $20 million.[20]  Such a consideration is also more appropriate when the debtor is a business where cash flow is needed in order to maintain ongoing operating expenses and/or to fund a plan.  Additionally, the Landlord is well aware that, to date, much of the money that would otherwise be distributed to the Debtor on account of his real estate ventures/projects have been reinvested in those projects to increase their value, all to the benefit of the Landlord and the other creditors of the Debtor.

(4)    "Debtor's cash flow is – at least during certain months – insufficient to meet Debtor's expenses." (*See* Motion at ¶64(iv))

- This contention is nothing more than a "red herring" as there is no dispute that the Debtor is paying all of his ongoing post-petition expenses with the exception of the legal fees and expenses incurred by his professionals.

(5)    "[T]here has been no showing of any financial pressure on the Debtor on the part of creditors other than 3 West 16th Street or of financial distress as a consequence of other creditors' purported claims." (*See* Motion at ¶64(v))

- This is not a separately enumerated factor under the *C-TC 9th Avenue* analysis and is largely duplicative of the Landlord's contention with regard to the purported absence of any "real" non-insider creditors.[21]

Similarly without merit is the Landlord's argument that the Debtor filed his chapter 11 petition to take advantage of § 506(b)(6) or any other provision of the Bankruptcy Code as a tactical step in his litigation with the Landlord.  The legitimate reasons underlying the Debtor's

---

[20] In this regard, the Landlord had correctly characterized the Debtor in one of its prior filings with this Court as "asset rich, but cash poor".

[21] To the extent that the Landlord relies upon its allegations (and innuendos) concerning certain pre and post-petition transfers and events allegedly involving the Debtor in support of its contention that the Debtor's chapter 11 petition was filed in bad faith, said allegations are addressed, explained and/or rebutted in specific detail in the Ancona Decl.

19

decision to seek relief under chapter 11 are set forth at length above and, thus, will not be repeated herein. The only provisions of the Bankruptcy Code which the Debtor specifically sought to avail himself of were a stay of the financial oblivion that was being forced upon him while giving him the time and means necessary to formulate orderly and comprehensive plan to address his financial affairs.

Moreover, the Landlord's insinuations as to the purported negative import of a debtor's desire to use § 502(b)(6) are simply wrong. Specifically, the Landlord quotes *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108 (3d Cir. 2004), for the proposition that "to be sure 'at least one Bankruptcy Court has dismissed for lack of good faith a [c]hapter 11 petition seeking primarily to cap a landlord's claim for future rent under § 502(b)(6)." (*See* Motion at ¶49)  However, the case under review in *Integrated Telecom* involved the question of whether a debtor's desire to utilize § 502(b)(6) established good faith in and of itself and not whether such a desire, standing alone, evidenced bad faith:

> The Bankruptcy Court did not hold that Integrated's desire to take advantage of the § 502(b)(6) cap established *good* faith.  Instead, the Bankruptcy Court held that "it does not establish *bad* faith for a debtor to file a chapter [11] case for the purpose of taking advantage of provisions which alter pre-petition rights, including altering the right of a landlord under State law." (Emphasis added).  We agree.  Indeed, we believe it to be a truism that it is not bad faith to seek to avail oneself of a particular protection in the Bankruptcy Code - Congress enacted such protections with the expectations that they would be used *In re James Wilson Assoc.*, 965 F.2d 160, 170 (7th Cir. 1992) ("It is not bad faith to seek to gain an advantage from declaring bankruptcy – why else would one declare it?").
>
> The far more relevant question is whether a desire to take advantage of a particular provision in the Bankruptcy Code, standing alone, establishes *good* faith.  We hold that it does not.  Just as a desire to take advantage of the protections of the Code cannot establish *bad* faith as a matter of law, that desire cannot establish *good* faith as a matter of law.  Given the truism that every bankruptcy petition seeks some advantage offered in the Code, any other rule would eviscerate any limitation on Chapter 11 filings.

*Id.* at 128.

Additionally, in *In re Liberate Technologies*, 314 B.R. 206 (Bankr. N.D. Cal. 2004), *i.e.*, the single case identified by the *Integrated Telecom* Court as having dismissed, for lack of good faith, a [c]hapter 11 petition seeking primarily to cap a landlord's claim for future rent under § 502(b)(6)", the debtor had asserted (as had the debtor in *Integrated Telecom*) that its desire to utilize the § 502(b)(6) cap on lease damages was affirmative evidence that it had filed its chapter 11 petition in good faith (and not as an alleged basis for a finding of bad faith). *Id.* at 215. The *Liberate Technologies* Court noted the only case binding upon it, *i.e.*, *Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070 (9th Cir. 2002), suggested that "use of the rent cap is neutral" in the good faith/bad faith analysis and that said analyses "requires consideration of all facts and circumstances, and that a debtor's use of a code provision cannot by itself establish bad faith." *Liberate Technologies*, 314 B.R. at 215-16. The Court went on to note that "[a]ny suggestion that use of section 502(b)(6) is more than a neutral factor confuses Congressional *objectives* with the *means* chosen to achieve those objectives…In sum, Debtor's proposed use of section 502(b)(6) does not establish either good faith or bad faith." *Id.* at 216 (emphasis in original). Respectfully, the Landlord's contrived contentions in this regard are without merit.

Put simply, the Landlord has failed to establish that "cause" for conversion of the Debtor's case exists as a bad faith filing.

(ii)    *The Landlord Has Not Demonstrated Any Other Basis for "Cause"*

The Landlord's additional contentions regarding the purported existence of "cause" to convert the Debtor's case to chapter 7 are without merit and can be summarily addressed as follows:

21

(1)    "[T]here is no likelihood of rehabilitation on Debtor's part." (*See* Motion at ¶¶67

and 72)

- This conclusory statement is premised on nothing more than the Landlord's repeated statements as to the Debtor having not proposed a chapter 11 plan to date. Given the significant disagreement in the amount of the Amended Claim (and the Initial Claim before that) asserted by the Landlord against the Debtor, which has now grown to more than $20 million, it has not and would not be possible for the Debtor to properly formulate a chapter 11 plan absent a determination from this Court liquidating the Amended Claim. How would the Debtor possibly know what level of funding, if any, would be needed to provide acceptable treatment for the Amended Claim absent such a determination? Nevertheless, the Landlord suggests that the Debtor should simply immediately start selling off his assets despite the wide range of possible outcomes concerning the Amended Claim. The Debtor believes that, after the reconciliation/adjudication of the Amended Claim (among other claims asserted against him) have been completed, he will have the funds/means necessary to propose and confirm a chapter 11 plan in short order.[22] There should be no legitimate dispute thereon. It would simply be premature and, quite frankly, unnecessary for the Debtor to file a plan and disclosure statement at this stage of the case. Again, the Debtor wants to push forward with trial concerning the Amended Claim, yet the Landlord has "stepped on the brakes". Additionally, the Landlord's objection to confirmation of a chapter 11 plan proposed by the Debtor would not necessarily be fatal. By way of example only, the Debtor could propose a plan with multiple impaired classes and seek confirmation on a "cram down" basis if one impaired class votes to accept the plan or the Debtor could propose a plan of reorganization or partial liquidation providing for full payment of any claim held by the Landlord thereby rendering said claim unimpaired and not entitled to vote to accept or reject the plan. The Landlord's contentions in this regard simply fail to support any finding of "cause".

(2)    "Debtor has a readily observable 'conflict of interest in properly investigating and

pursuing potential fraudulent transfers' against his own brother and/or certain entities in which he

holds ownership interests." (*See* Motion at ¶68)

- This is not a basis for a conversion of the Debtor's chapter 11 case to chapter 7 nor for the appointment of a chapter 11 trustee to look into possible and/or alleged fraudulent conveyances. At the outset, any such investigation would be premature at this stage of the case as the amount needed to confirm a chapter 11 plan cannot be determined until

---

[22] The Debtor's asset holdings are more fully described in his schedules filed with this Court and in the Amended Periodic Report Regarding Value, Operations and Profitability of Entities in Which the Debtor Holds a Substantial or Controlling Interest as is required by Bankruptcy Rule 2015.3 (the "Periodic Report"). (See Pick Decl., Exs. B and D) Depending upon the amount, if any, that is adjudged to be owed to the Landlord on account of the Amended Claim, the Debtor believes that he could liquidate certain of his assets and/or obtain financing to fund a chapter 11 plan or could propose a plan of partial liquidation.

22

the amount of the Amended Claim has been adjudicated.  Moreover, any potential conflict could be resolved through the employment of special counsel or the appointment of an examiner at a more appropriate time.  Finally, the Court should note that the Landlord has not made any efforts to obtain relief from the automatic stay so as to continue either the State Court Action or the Fraudulent Conveyance Action.

(3)    "Debtor has failed to properly act as a fiduciary by failing to provide information to his creditors."  (*See* Motion at ¶¶69 - 71)

- As discussed at length in the Ancona Decl., the Debtor has continually and voluntarily provided full disclosure to the Landlord and the United States Trustee.  Moreover, none of the events referenced by the Landlord in the Motion have been alleged to have been conducted in a secret manner and the Landlord does not accuse the Debtor of having done anything behind "closed doors".  Such disclosures included a copious amount of documents and information provided to the Landlord on a rolling basis pursuant to Bankruptcy Rule 2004 concerning the Debtor and many corporate entities.  The Debtor also filed a sizeable Amended Periodic Report Regarding Value, Operations and Profitability of Entities in Which the Debtor Holds a Substantial or Controlling Interest as is required by Bankruptcy Rule 2015.3 (the "Periodic Report"), providing financial statements and specific details concerning the Debtor's holdings.  The Periodic Report and other disclosures that were provided by the Debtor on request were fully vetted by the United States Trustee. Respectfully, the Landlord's complaints are without merit.

Also, much the same as in this case, *In re Century/ML Cable Venture*, 294 B.R. 9 (Bankr. S.D.N.Y. 2003), involved a debtor who had incurred a substantial financial liability which it did not have the ability to satisfy from its current cash flow and without a substantial liquidation of its assets.  In considering a motion made by the debtor's major credit to dismiss on bad faith grounds, the *Century/ML Cable* Court addressed the *C-TC 9th Ave.* factors and found that the other claims against the debtor were "modest" as compared to the major creditor's claim and that the debtor's financial condition was in large part a two-party dispute between the debtor and the major creditor which had been the subject of ongoing litigation.  *Id.* at 35.  The *Century/ML Cable* Court also considered the objecting creditor's contention that a plan could not be confirmed over its objection.

23

Notwithstanding the foregoing facts and circumstances, the *Century/ML Cable* Court

looked at the totality of the circumstances and held as follows:

> …[A]s the Court does not engage in a mechanical counting exercise [with regard to the *C-TC 9th Ave.* factors], the Court believes that the Cable Venture's filing does not warrant dismissal for cause, as an overview of the Cable Venture's situation suggests that chapter 11 relief is warranted. The case, which went through to confirmation – has a huge financial liability which it does not have the ability to pay out of current cash flow, and without a substantial liquidation of its assets. A number of courts have recognized as legitimate chapter 11 filings by other debtors in similar circumstances.
>
> ML Media contends that "the Joint Venture's lack of a valid reorganization purpose is shown by the fact that the Joint Venture will not be able to confirm a plan of reorganization without the consent of ML Media, its largest creditor" and that the "Joint Venture's filing appears to be entirely based on the impermissible goal of gaining a tactical advantage in its pending litigation." It may indeed be hard (or impossible) for the Cable Venture to confirm a plan without reaching an accommodation with ML Media but that is not determinative at this time. There is no requirement in the Bankruptcy Code that the Cable Venture prove it can confirm a plan in order to file a petition.

243 B.R. at 35-6 (internal citations omitted).

Respectfully, the Landlord has failed to meet its burden to demonstrate the existence of

"cause" for the requested conversion of the Debtor's case.

2. **Even if "Cause" is Determined to Exist, the Debtor's**
   **Case Should Not Be Converted to Chapter 7**

Even assuming, for the sake of argument only, that the Court were to determine that the

Landlord had established "cause" under § 1112(b) of the Bankruptcy Code, conversion of the

Debtor's case to chapter 7 would not be appropriate. In this regard, § 1112(b)(2) of the

Bankruptcy Code provides, in relevant part:

> (2) The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that--

24

(A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

(B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)--

(i)    for which there exists a reasonable justification for the act or omission; and

(ii)    that will be cured within a reasonable period of time fixed by the court.

As discussed above, and as stated by the Debtor since the inception of this case, the Debtor is prepared to immediately proceed to trial on the Amended Claim and, thereafter, to proposed a chapter 11 plan in short order. The Debtor's efforts in this regard have been frustrated by the fact that the Landlord, who had initially asserted damages of not less than $1,398,093.06, has asserted and has refused to pare the blatantly exaggerated Amended Claim for $20,561,342. Respectfully, the Debtor can confirm a plan within a "reasonable period of time". Additionally, the Debtor has addressed and/or explained each of the grounds asserted by the Landlord for converting the Debtor's chapter 11 case. Nevertheless, to the extent that the Court may perceive any grounds for such relief that are susceptible to cure, the Debtor would request that he be provided with an opportunity to do.[23]

---

[23] The Landlord disingenuously attempts to create a non-existent additional requirement under § 1112(b)(2) that the Debtor "must have some special ability to maximize value for creditors" in order to avoid conversion or dismissal once "cause" has been demonstrated. (*See* Motion at ¶¶53 and 73) Said assertion is premised entirely upon a *partial* quotation from *In re Picacho Hills Util. Co.*, 518 B.R. 75 (Bankr. D.N.M. 2014). Specifically, the *Picacho Hills* Court held that the debtor therein, which had no operations or income and all of its assets had already been liquidated and was essentially a corporate shell, no longer had any "legitimate chapter 11 purpose". *Id.* at 81. Solely within this context, the *Picacho Hills* Court stated that "[t]o avoid conversion or dismissal, *a defunct Chapter 11 debtor* must have some special ability to maximize value for creditors." *Id.* Cleverly, the Landlord omitted the "defunct Chapter 11 debtor" language when quoting *Picacho Hills* for the proposition that a showing of such a "special ability" was required in all cases in order to avoid conversion. Indeed, the Debtor's counsel was not able to identify a single case supporting the existence of any such requirement. A showing of such a "special ability to maximize value" may be appropriate in cases such as *Picacho Hills* involving a shell corporation as a chapter 7 trustee is arguably better suited to "pick the bones" that are left of the debtor in an effort to recovery any remaining value for creditors. However, in this case, the Debtor is certainly not "defunct" and has extensive assets the Debtor himself brings value to and, thus, is

25

Additionally, the "best interests of creditors" regarding the decision to convert or dismiss a case once "cause" has been established is not defined in the Bankruptcy Code and is a matter committed to the discretion of the court requiring consideration of the "totality of facts and circumstances of the individual case." *Hampton Hotel*, 27 B.R. at 359; *see also In re 1031 Exchange Group, LLC*, 374 B.R. 78 (Bankr. 2007); *In re Syndicom Corp.*, 268 B.R. 26, 43 (Bankr. S.D.N.Y. 2001). In conducting this analysis, the court evaluates the alternatives and chooses the one that would be most advantageous to the estate as a whole. *Id.* Any or all of the following factors are relevant in determining whether conversion or dismissal is in the "best interests of creditors": (1) whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal; (2) whether there would be a loss of rights granted in the case if it were dismissed rather than converted; (3) whether the debtor would simply file a further case upon dismissal; (4) the ability of the trustee in a Chapter 7 case to reach assets for the benefit of creditors; (5) in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise; (6) whether any remaining issues would be better resolved outside the bankruptcy forum; (7) whether the estate consists of a single asset; and (8) whether the debtor had engaged in misconduct and whether creditors are in need of a Chapter 7 case to protect their interests. *Id.* (citations omitted).

The Landlord fails to address any of these factors, but rather merely chants its false mantra concerning the purported lack of disclosure, lack of a proposed plan and the existence of pre-petition transfers which should allegedly be investigated. In this regard, the Landlord entirely fails to discuss why conversion is the better alternative to dismissal of the Debtor's case. As such,

---

clearly distinguishable from the debtor in *Picacho Hills*. Accordingly, the Landlord's contentions in this regard should be ignored by the Court.

26

the Landlord has failed to meet its burden in this regard.

**B. The Appointment of a Chapter 11 Trustee is Not Warranted**

Respectfully, the Landlord has also not set forth any meritorious basis for its alternative

request that a chapter 11 trustee be appointed, either by providing evidence of "cause" therefor or

establishing that such relief is in the best "interests of creditors...and other interests of the estate".

In this regard, §§ 1104(a)(1) and (a)(2) of the Bankruptcy Code provides, in relevant part:

> (a)    At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee--
>
> > (1)    for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
> >
> > (2)    if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

1. The Landlord Has Failed to Establish the Existence of "Cause" for the Appointment of a Chapter 11 Trustee Under § 1104(a)(1) of the Bankruptcy Code

In *1031 Tax Group*, Judge Glenn acknowledged that the appointment of a chapter 11

trustee is an "extraordinary" remedy and aptly described the considerations a court must make in

determining whether or not to appoint a chapter 11 trustee for "cause" under § 1104(a)(1) as

follows:

> The appointment of a chapter 11 trustee is an extraordinary remedy. *In re Euro-American Lodging Corp.*, 365 B.R. 421, 426 (Bankr. S.D.N.Y. 2007) (noting "the appointment of a § 1104 trustee is an extraordinary remedy"); *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989) ("it is settled that appointment of a trustee should be the exception, rather than the rule.") (collecting cases). There is a strong presumption that a debtor should remain in possession absent a showing of need for the appointment of a trustee. *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990); 7 Collier on Bankruptcy P 1104.02[3][b] (15th Ed.

27

2006).   The party seeking appointment of a chapter 11 trustee has the burden of showing, by clear and convincing evidence, "cause" under § 1104(a)(1), or the need for a trustee under § 1104(a)(2).   *Euro-American Lodging Corp.*, 365 B.R. at 426; (*citing In re Marvel Entertainment Group,* 140 F.3d 463, 471 (3d Cir. 1998)).

In support of it request for the appointment of a chapter 11 trustee under § 1104(a)(2), the Landlord does little more than reassert the same grounds for "cause" as it did with regard to its request that the Debtor's case be converted.   Said allegations, which fall far short of constituting clear and convincing evidence of "cause", are addressed at length above and in the Ancona Decl. Briefly, the Debtor has complied with all of his duties as a debtor-in-possession and has endeavored to move his case toward confirmation of a chapter 11 plan.   In this regard, the Debtor has conducted all of his affairs openly and honestly (and which affairs are monitored by the United States Trustee) and the Landlord does not accuse the Debtor of any acts of malfeasance.   The best that the Landlord can do in this regard is allege that a trustee might do things differently if appointed which might benefit the Landlord.   The Landlord's allegations simply fall well short of the standard for the "extraordinary" remedy of appointing a chapter 11 trustee.[24]

Additionally, the Landlord's contention that the "acrimony" that exists between it and the Debtor constitutes a basis to appoint a chapter 11 trustee is misplaced.   While the Debtor acknowledges the (apparently personal) antagonism that the Landlord has towards him, if such strife between a debtor and a creditor was sufficient to warrant the appointment of a chapter 11 trustee in all case, there would rarely be such a thing as a "debtor-in-possession".   *See In re Smart World Techs., LLC*, 383 B.R. 869, 877 (S.D.N.Y. 2008) ("some degree of antagonism and animosity between a debtor and creditor can be expected in any bankruptcy proceeding."); *In re*

---

[24] The basis for the strong presumption against appointing an outside trustee is that there is often no need for one: "[t]he debtor-in-possession is a fiduciary of the creditors and, as a result, has an obligation to refrain from acting in a manner which could damage the estate, or hinder a successful reorganization."   *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 1998).

28

*Adelphia Communications Corp.*, 336 B.R. 610, 661 n. 126 (Bankr. S.D.N.Y. 2006) (noting

commonplace nature of acrimony in bankruptcy proceedings, and refusing to appoint trustee for

mere acrimony).[25]    The only animosity expressed by a creditor has been from the Landlord whose

interests are antithetical to the other creditors and the interests of this case.    Upon information and

belief, no other creditor nor the United States Trustee supports the relief sought by way of the

Motion.    Put simply, any antagonism between the Debtor and the Landlord that exists is

insufficient to render further proceedings impossible.

2.    The Landlord Has Failed to Establish That the Appointment of a
    Chapter 11 Trustee Would Be in the Best Interests of Creditors and
    All Interests of the Estate Under § 1104(a)(2) of the Bankruptcy Code

In *1031 Tax Group*, Judge Glenn further described the considerations a court must make in

determining whether or not to appoint a chapter 11 trustee under § 1104(a)(2) as follows:

> Even if the Court does not find that "cause" exists to appoint a chapter 11 trustee
> under § 1104(a)(1), the Court may still appoint a trustee if it is in the "interest of the
> creditors...and other interests of the estate." 11 U.S.C. § 1104(a)(2).    Section §
> 1104(a)(2) "envisions a flexible standard" and "gives the district court discretion to
> appoint a trustee when doing so would serve the parties' and estate's interests." *In
> re Marvel Entertainment*, 140 F.3d at 474 (*quoting In re Sharon Steel Corp.*, 871
> F.2 at 1226) (internal quotations omitted); *In re Ionosphere*, 113 B.R. at 168
> (noting that "courts look to the practical realities and necessities" in considering
> whether to appoint a chapter 11 trustee under § 1104(a)(2).    "The twin goals of the
> standard for appointment of a trustee should be protection of the public interest and

---

[25] In *Marvel*, the court emphasized the fact-intensive and discretionary nature of the decision regarding whether to appoint a trustee: "We expressly hold that there is no *per se* rule by which mere conflicts or acrimony between debtor and creditor mandate the appointment of a trustee...In the view we take, it is within the district court's sound discretion to make a determination of cause, and this requires fact finding and application of the facts to relevant percepts." 140 F.3d at 473; *see also In re North Star Contracting Corp.*, 128 B.R. 66 (Bankr. S.D.N.Y. 1991) (In determining whether appointment of Chapter 11 trustee is warranted, bankruptcy court must weigh all factors and interests carefully, since appointment of trustee is extraordinary remedy which will cause additional expense to the estate).    Rather, the only forms of conflicts and animosity that warrant appointment of a trustee are those that make reorganization impossible. *See e.g. In re Marvel Entertainment Group, Inc.*, 140 F.3d at 473 (appointing trustee where "Johnny-come-lately" debtor fiduciary was also major creditor of debtor, and conflicts between debtor management acting in its best interests as creditor made reorganization impossible); *In re Colorado-Ute Elec. Assoc., Inc.*, 120 B.R. 164,176 (Bankr. D. Colo. 1990) (finding cause to appoint trustee under § 1104(a)(1) when the court could not "envision a way for the current management and board to resolve the inherent conflict between what is best for Colorado-Ute, its creditors and the co-op members").

interests of creditors...and facilitation of a reorganization that will benefit both the creditors and the debtors..." *Id.* (*quoting* House Report, 124 Cong.Rec.H11, 11 (daily ed. Sept. 28, 1978)). Although the standard is amorphous and necessarily involves a great deal of judicial discretion, courts have considered several factors including: "(i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects of the debtor's rehabilitation; (iii) the confidence - or lack thereof - of the business community and of the creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of appointment." *Euro-American Lodging Corp.*, 365 B.R. at 427 (*quoting In re Ionosphere*, 113 B.R. at 168) (citations omitted); *In re V. Savino Oil & Heating Co.*, 99 B.R. [518] at 527 n. 11 [(Bankr. E.D.N.Y. 1989)] ("[T]he factors constituting a basis for appointing a trustee under § 1104(a)(2) are amorphous, diverse, and necessarily involve a great deal of judicial discretion"). In essence, § 1104(a)(2) reflects "the practical reality that a trustee is needed." *In re V. Savino Oil & Heating Co.*, 99 B.R. at 527 n. 11.

The Landlord pays mere lip service to the above-described considerations and, once again, merely relies on its assertions made in support of its request for conversion. The Landlord's biased insinuation that the Debtor's trustworthiness has been "called into question" is entirely unsupported by evidence. Moreover, the Landlord fails to discuss any legitimate benefits that the appointment of a chapter 11 trustee would bring other than the fact that the Landlord believes that such an appointment would be more convenient to advancing the Landlord's interests. Respectfully, there is no meritorious basis for the appointment of a chapter 11 trustee.

30

## CONCLUSION

Based upon the foregoing, the Debtor respectfully requests that the Court deny the Motion in its entirety and grant such other and further relief as may be just and proper.

Dated: New York, New York
       October 6, 2016

PICK & ZABICKI LLP
Counsel to the Debtor

By:
Douglas J. Pick
369 Lexington Avenue, 12th Floor
New York, New York 10017
(212) 695-6000

31