UNITED STATES BANKRUPTCY COURT      <u>**NOT FOR PUBLICATION**</u>
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re:                                     Chapter 11

Steven J. Ancona,

                                        Case No. 14-10532 (MKV)

                      Debtor.

------------------------------------------------------------x

### DECISION ON
### MOTION OF 3 WEST 16TH STREET, LLC TO CONVERT CHAPTER 11 CASE TO
### <u>CHAPTER 7 CASE OR, ALTERNATIVELY, TO APPOINT A CHAPTER 11 TRUSTEE</u>

APPEARANCES:

McLAUGHLIN & STERN, LLP
*Counsel to 3 West 16th Street, LLC*
260 Madison Avenue
New York, New York 10016
By:     Matthew D. Sobolewski, Esq.
        Chester R. Ostrowski, Esq.

PICK & ZABICKI LLP
*Counsel to the Debtor, Steven J. Ancona*
369 Lexington Avenue, 12th Floor
New York, New York 10017
By:     Douglas J. Pick, Esq.
        Eric C. Zabicki, Esq.

MARY KAY VYSKOCIL,
UNITED STATES BANKRUPTCY JUDGE

       Pending before the Court is the motion of 3 West 16th Street, LLC (the "<u>Landlord</u>") for

an order converting the chapter 11 case of Steven J. Ancona (the "<u>Debtor</u>") to a chapter 7 case

or, alternatively, appointing a chapter 11 trustee (the "<u>Motion</u>"). *See* ECF No. 245. The Debtor

has submitted a memorandum of law in opposition to the Motion (the "Objection")[1] [ECF No.

260] and the Landlord has filed a reply to the Objection.  *See* ECF No 263.

The Court held a hearing, on November 3, 2016, to consider the Motion (the "Hearing")

and, later the same day, for the reasons stated on the record at the Hearing, entered an order

denying the Landlord's request for an order converting the Debtor's chapter 11 case and granting

the Landlord's request for the appointment of a chapter 11 trustee.  *See* Order, dated November

3, 2016 (the "Order") [ECF No. 269].  The Court stated at the Hearing, and set forth in the Order,

that an opinion setting forth the Court's reasoning in greater detail would follow in due course.

This is that opinion.

## I.    BACKGROUND

The underlying dispute between the Debtor and the Landlord concerns a six-story

building in Manhattan's Flatiron district, located at 3 West 16th Street (the "Building"),

previously owned by the National Council of Young Israel (the "NCYI"), which had provided

portions of space within the Building to two synagogues (together, the "Synagogues").  *See*

Ancona Aff. at ¶ 23.  At the outset, NCYI wished to sell the Building tenant-free, which would

have required that the Synagogues vacate the Building.  A dispute between the NCYI and the

Synagogues ensued as a result, and the Debtor was consulted to assist in resolving that dispute.

*See id.* at ¶¶ 23, 24.  The dispute ultimately was resolved, and the Synagogues and NCYI

executed a settlement agreement that contemplated, *inter alia*, that the Debtor would form an

entity, *i.e.* the Landlord entity, to purchase the Building.  *See id.* at ¶¶ 24, 26.  According to the

---

[1] In addition to the various exhibits annexed thereto, the Objection also includes, as attachments, the declaration of
Steven J. Ancona in opposition to the Motion, dated October 6, 2016 (the "Ancona Decl.") and the declaration of
Douglas J. Pick in opposition to Motion, (the "Pick Decl.").  The Affidavit of Steven J. Ancona in Support of his
Motion for Summary Judgment Expunging or Substantially Reducing the Amended Claim Filed by 3 West 16th
Street LLC, sworn to on August 6, 2015 (the "Ancona Aff.") is attached as Exhibit A to the Pick Decl.

Debtor, as part of the settlement agreement, the lower floors of the Building would be donated to the Synagogues and the upper floors would be converted into condominium units. *See id.* at ¶¶ 24, 26. Thereafter, an investor, Jack Braha ("Braha"), agreed to finance the purchase of the Building and certain contemplated renovations, and assumed ownership and control of the Landlord entity. *See id.* at ¶¶ 27-29. In March 2006, the NCYI sold the Building to the Landlord. *See id.* at ¶ 31. At or around the same time in March 2006, the Landlord and 3 West Development, LLC, an entity also newly-formed by the Debtor (the "Tenant"), entered into the Lease Between 3 West 16th Street, LLC as Landlord and 3 West Development, LLC as Tenant, dated March 24, 2006 (the "Lease"). *See id.* at ¶ 31. On the same date, the Debtor executed a Guaranty and Indemnity, whereby he personally guaranteed 45% of the obligations of the Tenant under the Lease (the "Guaranty"). *See id.* at ¶ 33.

## A.    The State Court Action

After the Lease and Guaranty were executed, disputes arose between the Debtor and the Landlord. By letter dated May 8, 2008, the Landlord terminated the Lease, effective June 7, 2008. *See id.* at ¶ 37. The Synagogues and the Tenant commenced an action against the Landlord in the Supreme Court of the State of New York, County of New York, asserting, *inter alia*, that the Landlord had breached its funding obligations and refused to cooperate in the conversion of certain portions of the Building to condominiums. *See Magen David of Union Square v. 3 West 16th Street, LLC*, Index No. 600573/2008 (N.Y. Sup. Ct., N.Y. County, June 6, 2008) (the "State Court Action"). In response, the Landlord asserted counterclaims against the Tenant and the Synagogues for breach of contract, possession and indemnification, and commenced a third-party action against the Debtor to enforce the Guaranty. *See id.*

3

On January 11, 2010, the State Court granted summary judgment in favor of the Landlord

on, among other things, its third-party complaint against the Debtor for breach of the Guaranty.

*See* Decision entered by the Honorable Debra A. James in the State Court Action, dated January

11, 2010 (the "State Court Summary Judgment Decision").  In the State Court Summary

Judgment Decision, the Court also directed that the Landlord shall have a hearing on damages.

The settled Order was entered by the State Court on July 16, 2010.  On September 29, 2011, the

Appellate Division, First Department, affirmed the State Court Summary Judgment Decision (the

"Appellate Division Order").  *See Magen David of Union Square, et al. v. 3 West 16th Street,*

*LLC*, 89 A.D.3d 24 (N.Y. App. Div. 1st Dep't 2011).

## B.    The Fraudulent Conveyance Action

Approximately two weeks after the Appellate Division affirmed the State Court

Summary Judgment Decision, the Debtor transferred his interests in certain other real property to

newly-formed special purpose entities.  Specifically, on October 15, 2011, the Debtor conveyed

his 70.68% ownership interest in real property located at 31 Bethune Street, New York, New

York) (the "Bethune Property") to 31 Bethune Street, LLC, a special purpose entity that the

Debtor and his family members had newly formed.  *See* Ancona Decl. at ¶ 15.  On the same day,

the Debtor conveyed his 20% ownership interest in real property located at 20 Warren Street,

New York, New York (the "Warren Property") to 20 Warren Street, LLC, another special

purpose entity that the Debtor and his family members also had newly formed.  *See* Ancona

Decl. at ¶ 15.  In exchange for the transfer of his ownership interests in the Bethune Property and

the Warren Property (together, the "Property Interest Transfers") to 31 Bethune Street, LLC and

20 Warren Street, LLC (together, the "SPE LLCs"), the Debtor received membership interests in

4

each newly-formed SPE LLC in an amount equal to his ownership interest in the corresponding real property.  *See* Ancona Decl. at ¶ 15.

On April 10, 2013, the Landlord commenced an action against the Debtor and the two SPE LLCs (collectively, the "Defendants") in the New York Supreme Court, titled *3 West 16th Street, LLC v. Steven Ancona, et al.*, Index No. 153301/2013 (N.Y. Sup. Ct., N.Y. County, Apr. 10, 2013) (the "Fraudulent Conveyance Action"), seeking, *inter alia*, to avoid the Property Interest Transfers as fraudulent conveyances under New York State Debtor and Creditor Law.  In that action, the Landlord argued that the Debtor acted with fraudulent intent by completing the Property Interest Transfers for the purpose of insulating himself from the judgment that the Landlord had obtained in the State Court Action.  By Decision and Order dated October 1, 2013 (the "Fraudulent Conveyance Decision"), the State Court denied the Defendants' motion for summary judgment in the Fraudulent Conveyance Action.   On October 25, 2013, the Defendants filed a Notice of Appeal of the Fraudulent Conveyance Decision.

## C.      The Bankruptcy Case

The Debtor commenced his chapter 11 case on March 5, 2014 (the "Petition Date").  The Landlord has filed a proof of claim in the amount of $20,561,342 in the Debtor's chapter 11 case (the "Landlord Claim").

The Debtor is a self-employed individual, whose business is "in real estate investment enterprises."  *See* Affidavit of Steven J. Ancona Pursuant to Local Bankruptcy Rule 1007-2, March 4, 2014 (the "1007-2 Affidavit") at ¶ 2 [ECF No. 2].  Among his most significant assets are his membership interests in various limited liability companies, including, *inter alia*, the SPE LLCs: a 20% interest in 20 Warren Street, LLC, valued by the Debtor as of the Petition Date at $1.84 million; and a 70.7% interest in 31 Bethune Street, LLC, valued by the Debtor as of the

5

Petition Date at $2,474,500. *See* Voluntary Petition, Schedule B- Personal Property [ECF No.

1]. In addition, the Debtor holds a 1% interest in 264 West 22nd Units, LLC, valued by the

Debtor as of the Petition Date at $9,000, and a 95% interest in Flat Iron Real Estate Advisors

LLC ("FREA"). *See id.* The Debtor estimates that, as of June 30, 2016, FREA "had a total

value of not more than approximately $2,816,569." *See* Periodic Report Regarding Value,

Operations and Profitability of Entities in Which the Debtor Holds a Substantial or Controlling

Interest, November 1, 2016 (the "June Periodic Report") [ECF No. 268]. As discussed below,

the Debtor's father, Jack Ancona, also holds membership interests in certain of these limited

liability companies.

## II.    DISCUSSION

### A.    Conversion of the Chapter 11 Case

By its Motion, the Landlord seeks an order converting the Debtor's chapter 11 case to a

case under chapter 7 of the Bankruptcy Code for cause, including, *inter alia*, that the Debtor

commenced his chapter 11 case in bad faith. The conversion of a chapter 11 case to a chapter 7

case is governed by section 1112 of the Bankruptcy Code, which provides, in relevant part, that,

on request of a party in interest, and after notice and a hearing, the court shall convert a chapter

11 case to a chapter 7 case, or dismiss a chapter 11 case, whichever is in the best interests of

creditors and the estate, for "cause" unless the court determines that the appointment, under

section 1104(a) of the Bankruptcy Code, of a trustee or an examiner is in the best interests of

creditors and the estate. *See* 11 U.S.C. § 1112(b)(1). The moving party bears the burden to

establish "cause" under section 1112(b). *See In re Adbrite Corp.*, 290 B.R. 209, 214 (Bankr.

S.D.N.Y. 2003); *In re Pulp Finish 1 Co.,* 2013 WL 5487933, at *2 (Bankr. S.D.N.Y. Oct. 2,

2013). Even if a court finds that "cause" exists, the court is not obligated to convert the case, as

the decision remains within the court's broad discretion. *See In re 1031 Tax Group, LLC*, 374

B.R. 78, 93 (Bankr. S.D.N.Y. 2007) (citing 11 U.S.C. § 1112; H. Rep. 595, 95th Cong., 1st Sess.

405 (1977)).

Although section 1112(b)(4) of the Bankruptcy Code lists examples of what constitutes

"cause" for dismissal or conversion of a chapter 11 case, this list is not exhaustive. *See C-TC 9th*

*Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1311 (2d Cir. 1997) ("It

is important to note that this list is illustrative, not exhaustive."); *In re Kaplan Breslaw Ash, LLC*,

264 B.R. 309, 334 (Bankr. S.D.N.Y 2001). It is well-settled that the filing of a bankruptcy

petition in bad faith constitutes "cause" for dismissal or conversion of a case under Bankruptcy

Code section 1112(b). *See, e.g., In re C-TC 9th Ave. P'ship*, 113 F.3d at 1312; *In re Reyes,* 2015

WL 4624156, at *4 (Bankr. S.D.N.Y. Aug. 4, 2015); *In re Schur Mgmt. Co.,* 323 B.R. 123, 126

(Bankr. S.D.N.Y 2005). Once the moving party has made a *prima facie* showing of cause, the

burden then shifts to the debtor to demonstrate that the petition was filed in good faith. *See In re*

*Syndicom Corp.*, 268 B.R. 26, 49 (Bankr. S.D.N.Y. 2001). Neither malice not actual fraud is

required to find a lack of good faith. *See id.* at 49.

The Second Circuit has identified eight factors that support a finding that a chapter 11

case has been commenced in bad faith:

> (1) the debtor has only one asset;
>
> (2) the debtor has few unsecured creditors whose claims are small
> in relation to those of the secured creditors;
>
> (3) the debtor's one asset is the subject of a foreclosure action as a
> result of arrearages or default on the debt;
>
> (4) the debtor's financial condition is, in essence, a two party dispute
> between the debtor and secured creditors which can be resolved
> in the pending state foreclosure action;

7

(5) the timing of the debtor's filing evidences an intent to delay or
frustrate the legitimate efforts of the debtor's secured creditors
to enforce their rights;

(6) the debtor has little or no cash flow;

(7) the debtor can't meet current expenses including the payment of
personal property and real estate taxes; and

(8) the debtor has no employees.

*See In re C-TC 9th Ave. P'ship*, 113 F.3d at 1311.  These factors should not be considered in

isolation, as courts must consider the totality of the circumstances in each particular case.  *See id.*

at 1312 (noting that "a determination of bad faith requires a full examination of all the

circumstances of the case"); *In re Liberate Techs.*, 34 B.R. 206, 211 (Bankr. N.D. Cal 2004)

("Whether a petition is filed in good faith is to be determined upon consideration of all the facts

and circumstances of the case.").  Moreover, in determining whether cause exists for conversion

or dismissal under Code section 1112(b), courts may consider any or all of the factors identified

in *C-TC 9th Avenue Partnership*.  *See In re Hampton Hotel Investors, L.P.*, 270 B.R. 346, 359

(Bankr. S.D.N.Y. 2001).  Bankruptcy courts have wide discretion to determine whether cause

exists.  *In re 1031 Tax Group, LLC*, 374 at 93; *In re Adbrite Corp.*, 290 B.R. at 215.

Here, upon consideration of the factors identified by the Second Circuit, as applicable,[2]

the Court concludes, for the following reasons, that "cause" for conversion under section 1112

exists on the basis that the Debtor's bankruptcy case was commenced in bad faith.

---

[2] At the outset, the Court notes that Debtor has more than one asset.  His principal assets appear to be his interests in
the various limited liability companies, as discussed above.  Because the Debtor has more than one asset, the first
and third factors do not support the Court's finding that the Debtor's case was commenced in bad faith.   Although
the eight factors identified by the Court in *C-CT 9th Avenue Partnership* are frequently applied in single asset real
estate cases, given the circumstances of this case, they also are applicable here given, *inter alia,* the pending state
court actions commenced by the Landlord against the Debtor, and the fact that the Landlord, the party moving for
relief here, has asserted, by far, the most significant claim against the Debtor (*i.e.* $20,561,342 of the approximately
$24,046,213 in claims asserted against the Debtor).

1.      Other than the Landlord Claim, which is, by far, the largest unsecured claim

asserted against the Debtor, the Debtor has relatively few unsecured creditors who are not

insiders.[3]  The Debtor's claims register reflects that 13 proofs of claim, totaling approximately

$24,046,214, have been filed.[4]  Because one claim (in the amount of nearly $68,000) filed on

behalf of the Internal Revenue Service has since been withdrawn,[5] there are now a total of twelve

claims asserted against the Debtor.  Two of these claims are secured mortgage claims totaling

approximately $2.9 million.  Thus, other than Landlord Claim and claims held by insiders, the

unsecured claims asserted against the Debtor by the Claims Bar Date total approximately

$38,153.84 and consist of the following:  (1) a $3,175 claim by Toyota Motor Credit Corporation

("Claim 1"); (2) a $10.49 claim by American Express Bank, FSB ("Claim 2"); (3) a $1,204.90

claim by American Express Bank, FSB ("Claim 3"); (4) a $33,605 claim by American Express

Centurion Bank ("Claim 4"); (5) a $158.45 claim by the NYC Office of Administrative Trials

and Hearings ("Claim 5"); and (6) a claim by Congregation Magen David of Manhattan (for

which no amount was listed, but according to the proof of claim, the claim is for "obligations for

money owed and other potential claims") ("Claim 6").  The remaining unsecured claims on the

claims register are held by insiders of the Debtor, as follows:  (1) a $51,171.18 claim filed by

Rosenberg and Estis, P.C. ("R&E"), former special counsel to the Debtor, which claim has been

---

[3] An "insider" is defined in section 101(31(A)) of the Bankruptcy Code to include, with respect to an individual, a relative of the debtor, a general partner of the debtor, a partnership in which the debtor is a general partner, a general partner of the debtor and a corporation of which the debtor is a director, officer or person in control.  *See* 11 U.S.C. § 101(31(A)).

[4] By order dated March 19, 2014 (the "Bar Date Order"), the Court set April 30, 2014 as the date by which proofs of claim against the Debtor must be filed (the "Claims Bar Date").  *See* ECF No. 11.  The Bar Date Order further provides, *inter alia*, that "pursuant to Bankruptcy Rule 3003(c)(2), all holders of claims that fail to comply with this Order by timely filing a proof of claim in appropriate form shall not be treated as a creditor with respect to such claim for the purpose of voting and distribution."

[5] See ECF No. 108.

transferred to Jack and Arlene Ancona, the Debtor's parents ("Insider Claim 1");[6] (2) a $15,000

claim by 264 West 22nd Units, LLC, one of the limited liability companies in which the Debtor

holds an interest (c/o FREA), which was signed by the Debtor's father, Jack Ancona ("Insider

Claim 2"); and (3) a $375,059 claim asserted by the Debtor's father, Jack Ancona ("Insider

Claim 3" and together with Insider Claims 1 and 2, the "Insider Claims").[7]  As such, there is not

a significant creditor body that is to be protected by the Debtor's filing.

2.    The claims register, the Debtor's schedules, the various hearings before this

Court, and the docket reflect that this case, essentially, is a two-party dispute between the Debtor

and the Landlord that could have been resolved in the State Court Action (and the subsequent

Fraudulent Conveyance Action).[8]  In the two and a half years that have transpired since the

Petition Date, the Debtor has not undertaken any of the actions of typical chapter 11 debtors.  For

example, he has not: (a) objected to any claims - - other than the Landlord Claim; (b)

commenced any actions to recover pre-petition transfers; (c) moved to assume or reject any

contracts or leases; or (d) proposed a chapter 11 plan or disclosure statement.  Rather, the long-

standing dispute between the Debtor and the Landlord, which has been ongoing for

---

[6] *See* Transfer of Claim Other than for Security, dated September 4, 2014 [ECF No. 65].

[7] There remains a question of fact as to whether certain claims asserted by the Debtor's father should be disallowed on a number of grounds, including lack of documentary support and the expiration of the applicable statute of limitations.  *See* Motion at ¶¶ 24, 25.  The Court has not reviewed the Insider Claims for allowance purposes, and this Decision shall not constitute any findings of fact or conclusions of law with respect to any claims appearing on the claims register.

[8] Although the fourth and fifth factors articulated by the Second Circuit in the *C-TC 9th Avenue Partnership* case call for an analysis of a debtor's relationships with secured creditors, and here, the Landlord holds an unsecured claim, as noted above, courts may consider any or all of the factors identified by the Second Circuit, and should not consider the factors in isolation.  Courts consider the factors, or reasonable variants of them, as appropriate on a case-specific basis.  *See, e.g., In re Syndicom Corp.*, 268 B.R. at 50-51 (applying "reasonable variants" of the factors, including the fact that the debtor's case was filed for the predominant purpose of blocking a state court eviction proceeding commenced against the debtor by its landlord, also an unsecured creditor).  In the *Syndicom Corporation* case, the court concluded that the factors it applied, "even to the extent that they do not match up, in every regard, with the factors held in C-TC 9th Ave. to support a finding of a bad faith filing, overwhelmingly support a like conclusion here."  *Id.*

approximately eight years and reached a critical juncture immediately before the Debtor filed his Petition (namely, the adverse decisions in the State Court Action and the Fraudulent Conveyance Action), has been the Debtor's singular focus throughout his bankruptcy case.

On a number of occasions, the Court has afforded the Debtor's counsel an opportunity to explain the lack of progress in the Debtor's case. The response has been the same; *i.e.* – until the Landlord's claim is resolved, the Debtor cannot progress his case. For example, in his Objection, the Debtor states that "[g]iven the significant disagreement in the amount of the [claim] asserted by the Landlord against the Debtor . . . it has not and would not be possible for the Debtor to properly formulate a chapter 11 plan absent a determination from this Court liquidating [the Landlord's claim]." Objection at p. 22. Also, at a hearing on June 15, 2016 (the "Fee Hearing") to consider the Debtor's request for an order authorizing his father, Jack Ancona, to pay the Debtor's legal fees owing to R&E,[9] the Court expressed concern with the lack of progress in the case and asked the Debtor's counsel to explain why the Debtor had not objected to any claims (other than the Landlord Claim) or commenced any action to recover pre-petition transfers, particularly in light of the State Court's decision in the Fraudulent Conveyance Action. *See* Transcript ("Tr.") of June 15, 2016 Hearing at 23:10-13 [ECF No. 284]. The Debtor's counsel answered that, until the Landlord Claim has been resolved, the Debtor's counsel could not progress toward proposing a chapter 11 plan. *See id.* at 23:20 - 24:21. In fact, the Debtor's counsel essentially conceded at the Fee Hearing that the Debtor's case is a two-party dispute in arguing that "[t]he entire case is based upon this [the Landlord's] claim." *See id.* at 23:20-21.

---

[9] *See* Affidavit of Howard W. Kingsley in Support of (1) Order to Show Cause, Pursuant to Local Bankruptcy Rule 9077-1(A), and (2) Debtor's Emergency Motion for an Order Authorizing a Payment by Jack Ancona of Interim Legal Fees and Expenses Previously Awarded to Rosenberg & Estis, P.C. or, Alternatively, Relieving Rosenberg & Estis, P.C. as Special Counsel for the Debtor, June 6, 2016 [ECF No. 230] (the "Second Third-Party Fee Payment Application").

Based on the limited activity in the Debtor's case since March 2014 with respect to anything other than the Landlord Claim, as evidenced on the docket and the hearings in the Debtor's case, the Court finds that the Debtor's financial condition is, in essence, a two-party dispute between the Debtor and the Landlord that can be resolved in the State Court Action and the Fraudulent Conveyance Action.

3.      Moreover, the Court finds that the timing of the Debtor's filing evidences an intent to delay and frustrate the Landlord's efforts to proceed with the upcoming damages trial in the State Court Action and to avoid the Property Interest Transfers in the Fraudulent Conveyance Action.  This further supports the Court's determination that the Debtor's case was commenced in bad faith.  *See e.g., In re Wally Findlay Galleries (New York), Inc.*, 36 B.R. 849, 851 (Bankr. S.D.N.Y. 1984) (cited with approval in *In re C-TC 9th Ave. P'ship*, 113 F.3d at 1310) (case dismissed as a bad faith filing when the "debtor filed its petition herein to avoid the consequences of adverse state court decisions while it continues litigating" and "[t]he debtor is unable to propose a meaningful plan of reorganization until its litigation . . . is resolved.").  The Debtor does not deny that he commenced his bankruptcy case as a result of his disputes with the Landlord pending in State Court.  *See, e.g.,* Debtor's Emergency Motion for an Order Authorizing Third-Party Fee Payment of Interim Legal Fees and Expenses Awarded to Certain of his Professional, May 9, 2016 (the "First Third-Party Fee Payment Application") [ECF No. 209] at ¶ 2 ("The Debtor's chapter 11 filing was precipitated by certain protracted, costly and time consuming pre-petition litigation between the Debtor and [the Landlord] (among others) in connection with a real estate-related transaction/dispute."); 1007-2 Affidavit at ¶ 4 (wherein the Debtor stated that his "chapter 11 filing was precipitated primarily by a judgment which is anticipated to be entered against me in [the State Court Action]").

12

The Debtor asserts that he commenced his chapter 11 case to enable himself to fund the "additional massive legal fees" associated with litigating the damages phase of the State Court Action, and to satisfy any judgment, which, but for the filing of his petition, he would not be able to satisfy without immediately selling off certain assets at fire sale prices or borrowing large amounts of cash on unfavorable terms.[10]  *See* Ancona Decl. at ¶ 7.  Accordingly, the Debtor states that, after consulting with counsel, it was determined that, absent a settlement with the Landlord, it would be in his best interests to commence a chapter 11 case in order to preserve the value of his assets, "regroup," effectively challenge the damage amounts sought by the Landlord, and formulate a comprehensive plan to address all of his financial affairs.  *See* Ancona Decl. at ¶ 9.

According to the schedules to the Debtor's Voluntary Petition, as of the Petition Date, excluding exempt property, the Debtor had $500 in cash on hand, $100 in a checking account, $258 in a checking account jointly held with his wife, and $1,000 in a government bond.  *See* Voluntary Petition, Schedule B - Personal Property.  However, as discussed above, the Debtor also had significant and valuable interests in various limited liability companies, including, (a) the two SPE LLCs to which he had voluntarily transferred his ownership interests in real property soon after the Appellate Division Order, and (b) FREA, which the Debtor sought to have incur debt from an undisclosed source in order to pay the Debtor's legal fees in this case. The Debtor now asserts that the Property Interest Transfers, which occurred within weeks of the adverse decision in the State Court Action, were for estate and business planning purposes.  *See* Ancona Decl. at ¶ 16.  However, the State Court found that "[n]o explanation is given for Ancona's apparent sudden desire to transfer the properties to limited liability companies

---

[10] The Debtor further explains that the State Court Action and the Fraudulent Conveyance Action were taking a toll on his ability to concentrate on his work; *i.e.* his real estate ventures.  *See* Ancona Decl. at ¶ 7.

apparently under his or a family member's control." *See* Fraudulent Conveyance Decision, at p.

7. In addition, the State Court determined that "the exchanges between Ancona and the limited

liability defendants raise an issue of fact as to intent to hinder and delay the creditor's access."

*See* Fraudulent Conveyance Decision, at p. 4. Moreover, as the Landlord points out, the timing

of the Debtor's filing of the Voluntary Petition here effectively tolled the deadline for the Debtor

to perfect his appeal of the Fraudulent Conveyance Decision, which, absent an extension, was set

to expire on April 25, 2014. *See* Motion, at ¶ 20. Likewise, the automatic stay, under section

362 of the Bankruptcy Code, has stayed the upcoming damages trial in the State Court Action.

    4.      An analysis of the eighth *C-TC 9th Avenue Partnership* factor further supports the

Court's finding that the Debtor's case was commenced in bad faith, as the Debtor is not an

operating business with many employees whose livelihoods would be impacted by a conversion

or dismissal of the Debtor's chapter 11 case.

*      *      *

    In addition to the factors set forth in the *C-TC 9th Avenue Partnership* case, the Court also

bases its finding that the Debtor's case was filed in bad faith on the fact that the Debtor has not

alleged that he was under any financial pressure by creditors, or identified any existing or

imminent liabilities (unrelated to his ongoing disputes with the Landlord) for which the Debtor

purportedly lacked sufficient capital. This conclusion is in line with other decisions in this

District, in which courts have found that a petition was filed in bad faith if it is clear that, on the

filing date, there was no reasonable likelihood that the debtor intended to reorganize and no

reasonable probability that it would eventually emerge from bankruptcy proceedings. *See, e.g.*,

*In re Pulp Finish 1 Co.*, 2013 WL 5487933, at *2; *In re Schur Mgmt. Co.*, 323 B.R. at 128 ("The

issue is whether there is a valid 'intent to reorganize' or 'reorganizational purpose' to the

14

filing.") (citations omitted).   For the reasons discussed above, the Court finds that the Debtor did

not commence his bankruptcy case for the purpose of reorganizing debts.  Instead, he

commenced this case as a result of one potential debt that may have arisen in the State Court

Action after a trial on damages, which, as a result of his filing, is now subject to significant

reduction by operation of the cap under section 502(b)(6) of the Bankruptcy Code (discussed

below), and to forestall the State Court's scrutiny of the Property Interest Transfers in the

Fraudulent Conveyance Action.

The Landlord also argues that the Debtor commenced his bankruptcy case for the

improper purpose of taking advantage of Bankruptcy Code section 502(b)(6), which limits the

claims allowable to a debtor's landlord for damages resulting from the termination of a real

property lease.  *See* Motion, at ¶¶ 6, 20, 48, 49.   The Court finds instructive the decisions in

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc.* (*In re Integrated Telecom Express,*

*Inc.*), 384 F.3d 108 (3d Cir. 2004), and *In re Liberate Technologies.*, 314 B.R. 206 (Bankr. N.D.

Cal 2004).  In *Integrated Telecom Express,* a landlord moved to dismiss its tenant's bankruptcy

case on grounds that the case was commenced in bad faith.  *Integrated Telecom Express, Inc.*,

384 F.3d at 112.   The bankruptcy court determined that the tenant's desire to take advantage of

the section 502(b)(6) cap was not, alone, a sufficient basis on which to dismiss the petition as a

matter of law, and the District Court affirmed.  *See id.* at 115-116.  On appeal to the Third

Circuit, the issue before the court was whether a chapter 11 petition filed by a financially healthy

debtor, with no intention of reorganizing or liquidating as a going concern, with no reasonable

expectation that chapter 11 proceedings would maximize the value of the debtor's estate for

creditors, and solely to take advantage of the section 502(b)(6) cap, complies with the Code's

requirement that a petition be filed in good faith.  *See id.* at 112.  In analyzing the bad faith filing

allegation under section 1112(b), the Court relied heavily on the fact that the debtor/tenant in that

case was no longer in business and had no going concern value to preserve through a liquidation

or reorganization and, in fact, had over $100 million in cash and other assets at the time of the

petition date (and as such, was "highly solvent and cash rich at the time of the bankruptcy

filing"). *See id.* at 124. The Third Circuit concluded that because the debtor was not in financial

distress and had no significant debt other than the landlord's claim, the debtor's filing was not in

good faith. *See id.* Thus, the Third Circuit reversed the District Court's order affirming the

bankruptcy court's denial of the landlord's motion to dismiss, and remanded with instructions to

dismiss the petition. *See id.* at 129, 130. Notably with respect to the issue at hand, the Third

Circuit agreed with the bankruptcy court's determination that it does not, *per se*, establish bad

faith for a debtor to file a chapter 11 case for the purpose of taking advantage of provisions that

alter pre-petition rights, including altering the rights of a landlord under state law. *See id.* at 127.

However, the Circuit Court reasoned, section 502(b)(6) and the legislative policy underlying that

provision assume the existence of a valid bankruptcy filing, which, in turn, assumes a debtor in

financial distress. *See id.* at 128.

Similarly, in *Liberate Technologies*, a landlord moved to dismiss a debtor's bankruptcy

petition on the grounds that it was filed in bad faith. *See In re Liberate Techs.,* 34 B.R. at 208.

In that case, the debtor's cash exceeded its liabilities by at least $45 million, and possibly,

depending on the outcome of litigation, by $153 million, and application of the section 502(b)(6)

cap would have reduced the landlord's claim against the debtor by approximately $37 million.

*See id.* at 210, 215. The court noted that chapter 11 of the Bankruptcy Code provides strong

weapons that generally are not available outside of bankruptcy in order to help debtors deal with

financial distress. *See id.* at 211. It reasoned that, although it is well-settled that insolvency is

16

not a requirement for filing a chapter 11 petition, the implication of the tools available under chapter 11, particularly, the section 502(b)(6) cap on a landlord's damages, while not necessarily (in isolation) a factor showing good or bad faith, undoubtedly raises the stakes. *See id.* at 216. The *Liberate Technologies* court further reasoned that there is no evidence that Congress determined that state landlord-tenant law should be superseded by the Bankruptcy Code provisions except where necessary to help an entity with genuine financial problems. *See id.* at 217.

The Court agrees with the reasoning of these two decisions, and concludes that the Debtor's use of the section 502(b)(6) cap in this case, taken alone, does not indicate that his petition was filed in bad faith.  However, while the Debtor here was not cash rich on the Petition Date, he nevertheless had significant assets (namely, his interests in the limited liability companies) and has not alleged that he was under financial pressure from any creditors at the time he commenced his case.  Also, the Landlord - - the movant in this case - - is, by far, the largest creditor, whose two pending State Court actions against the Debtor (one of which concerns the Debtor's allegedly fraudulent transfer of real property interests for the purpose of frustrating the Landlord's ability to recover assets) have been stayed by operation of the filing. These factors, and the timing of the filing of the Debtor's case (and the most recent adverse judgment by the State Court), coupled with the Debtor's invocation of the section 502(b)(6) cap, further support the Court's finding that the Debtor's Petition was filed in bad faith.

Based on the totality of the circumstances discussed above, the Court's review of the papers submitted in favor of, and in opposition to, the Motion, the documentary evidence presented, the chapter 11 case file as set forth on the docket, and prior proceedings in this case, the Court finds that the Landlord has met its burden of demonstrating that cause exists to convert

the Debtor's chapter 11 case to a chapter 7 case on the grounds that the Debtor's case was filed

in bad faith. Specifically, the Court finds at least six indicia that support the finding of "cause"

under section 1112(b): (1) relatively few unsecured claims, other than the Landlord Claim and

the Insider Claims, have been filed by the Claims Bar Date (or otherwise set forth in the Debtor's

schedules); (2) this case essentially is a two-party dispute between the Debtor and the Landlord

that could have been resolved in the actions pending in the State Court; (3) the filing of the

Debtor's Petition, when he was under no alleged financial pressure by creditors, which delayed

the Debtor's need to perfect his appeal of the Fraudulent Conveyance Decision and forestalled a

trial on damages in the State Court Action, evidences an intent to frustrate the efforts of the

Landlord in the State Court Action and the Fraudulent Conveyance Action; (4) the Debtor has no

employees; (5) the Debtor's use of the section 502(b)(6) cap, considered together with the other

indicia discussed above; and (6) the Court's lack of confidence in the Debtor's willingness to

comply with the fiduciary duties of a debtor-in-possession, as discussed below, constitute

additional "cause" under section 1112(b).

In addition to the foregoing, the Court concludes that there is an independent ground on

which to find "cause" to dismiss or convert the Debtor's case. Code section 1112(b)(4)(F)

provides that, for purposes of section 1112(b), "cause" includes the "unexcused failure to satisfy

timely any filing or reporting requirement established by [the Bankruptcy Code] or by any rule

applicable to a case under chapter 11." 11 U.S.C. § 1112(b)(4)(F). As discussed below, the

Debtor has, without justification, failed to file periodic financial reports disclosing the "value,

operations, and profitability" of FREA and certain other limited liability companies in which the

Debtor owns an interest, as required under Rule 2015.3 of the Federal Rules of Bankruptcy

Procedure (each, a "Bankruptcy Rule"). Given that the Debtor's assets in the limited liability

18

companies are his most significant assets, the Debtor's failure to file the reports, as discussed

below, constitutes additional "cause" under section 1112(b).

*        *        *

Section 1112(b)(1) provides that a court <u>shall</u> convert a chapter 11 case to a chapter 7

case upon a finding of cause "<u>unless</u> the court determines that the appointment of a trustee under

section 1104(a) is in the best interests of creditors and the estate.  11 U.S.C. § 1112(b) (emphasis

added).  Notwithstanding the Court's determination that cause exists under section 1112 for

dismissal or conversion of the Debtor's chapter 11 case, for the reasons discussed below, the

Court finds that, at this time, the appointment of a chapter 11 trustee is in the best interests of

creditors and the estate and appropriate under section 1104(a).  The Court therefore denies the

Landlord's Motion insofar as it seeks to convert the Debtor's chapter 11 case and, for the reasons

discussed below, grants the Landlord's Motion insofar as it seeks the appointment of a chapter

11 trustee under section 1104(a).

## A.        Appointment of a Chapter 11 Trustee

Chapter 11 of the Bankruptcy Code is designed to allow a debtor-in-possession to retain

management and control of the debtor's business operations, unless a party in interest proves that

appointment of a trustee is warranted.  *See In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167

(Bankr. S.D.N.Y. 1990).  The appointment of a chapter 11 trustee is an extraordinary remedy,

and, absent a showing of the need for appointing a trustee, there is a strong presumption that a

chapter 11 debtor should be permitted to remain in possession.  *See In re Ionosphere Clubs, Inc.*,

113 B.R. at 167.  Accordingly, the party moving for appointment of a chapter 11 trustee bears

the burden of showing cause by clear and convincing evidence.  *See In re Ashley River*

*Consulting, LLC*, 2015 WL 1540941, at *9 (Bankr. S.D.N.Y. March 31, 2015).   Bankruptcy

19

courts have wide discretion in considering the relevant facts. *See id.* at *9. However, a

bankruptcy court is not required to conduct a full evidentiary hearing in considering a motion for

the appointment of a chapter 11 trustee. *See In re Ionosphere Clubs, Inc.*, 113 B.R. at 167.

### 1. *Appointment of a Chapter 11 Trustee Under § 1104(a)(1)*

Section 1104 governs the appointment of a chapter 11 trustee. The Landlord argues that

there is "cause" in this case for the appointment of a chapter 11 trustee under section 1104(a)(1)

based on: (1) the lack of progress in the Debtor's chapter 11 case; (2) the Debtor's conflict of

interest, which is reflected by the Debtor's refusal to (a) investigate pre-petition transfers which

may be recoverable under section 550 of the Bankruptcy Code, including the Property Interest

Transfers, and (b) object to the Insider Claims; and (3) the nature of the Debtor's dealings with

the various limited liability companies in which he and his family members hold interests. *See*

Motion, at ¶¶ 76 – 82.

Section 1104(a)(1) provides that, at any time after the commencement of a case, but

before confirmation of a plan, on request of a party in interest or the United States Trustee, and

after notice and a hearing, the court <u>shall</u> appoint a trustee for cause, including fraud, dishonesty,

incompetence or gross mismanagement of the affairs of the debtor by current management, either

pre- or post-petition, or similar cause, but not including the number of holders of securities of the

debtor or the amount of assets or liabilities of the debtor. *See* 11 U.S.C. § 1104(a)(1) (emphasis

added). Like the statutory language of section 1112(b)(4), the word "including" and here, the

words "or similar cause," before and after the enumerated listed examples of "cause" reflect that

the grounds for appointing a chapter 11 trustee are not limited to those specifically set forth in

the statute. *See* 11 U.S.C. § 102(3) ("'includes' and 'including' are not limiting"). Other factors

warranting the appointment of a trustee under section 1104(a)(1) include conflicts of interest,

inappropriate relations between corporate parents and subsidiaries, misuse of assets and funds,

inadequate record keeping and reporting, failure to disclose relevant and material information,

lack of credibility and creditor confidence, and various other similar instances of conduct. *See In re Ashley River Consulting, LLC*, 2015 WL 1540941, at *9; *In re Picacho Hills Utility Co., Inc.*,

518 B.R. 75, 82 (Bankr. D.N.M. 2014) (appointing a trustee because the court was "not

convinced that the Debtor is capable of pursuing estate causes of action in a professional and

unbiased manner."). A court may consider both pre- and post-petition misconduct of the current

management when making a determination of whether "cause" exists under section 1104(a). *See Ashley River Consulting, LLC*, 2015 WL, at *10.

The Court finds that conflicts of interest in this case abound and are evidenced by the

Debtor's general unwillingness to fulfill his fiduciary duties, including to investigate, much less

object to, any claim other than the Landlord Claim, failure to timely file periodic reports as

required under Bankruptcy Rule 2015.3, and his seemingly inappropriate dealings with FREA.

These derelictions have been demonstrated by clear and convincing evidence. The Court

concludes that these factors constitute "other similar cause" for the appointment of a trustee

under Code section 1104(a)(1).

Debtors-in-possession have a fiduciary duty to maximize the value of the estate. *See Hirsch v. Penn. Textile Corp, Inc. (In re Centennial Textiles, Inc.)*, 227 B.R. 606, 612 (Bankr.

S.D.N.Y. 1998) ("As fiduciaries, the debtor in possession and its managers are obligated to treat

all parties to the case fairly, maximize the value of the estate, . . . and protect and conserve the

debtor's property.") (internal citations omitted); *In re Ashley River Consulting, LLC*, 2015 WL,

at *8 (debtor-in-possession owes fiduciary duties to the bankruptcy estate and must, among other

things, protect and conserve property in its possession for the benefit of creditors and refrain

from acting in a manner which could damage the estate, or hinder a successful reorganization of the business) (citing *In re Ionosphere Clubs, Inc.*, 113 B.R. at 169).  A debtor-in-possession's fiduciary duties impose upon him the duty to make "impartial investigations and decisions in pursuing claims on behalf of the estate." *Picacho Hills Utility Co., Inc.*, 518 B.R. at 82.  If a debtor-in-possession defaults in its responsibilities, the debtor may be dispossessed of control of its business and a chapter 11 trustee should be appointed. *See Ashley River Consulting, LLC*, 2015 WL, at *8.

Here, notwithstanding that the Debtor's case has been pending since March 2014, the Debtor has, without justification, not made any meaningful efforts to investigate pre-petition transfers (and thereby determine whether to bring an action to recover, for the benefit of the estate, any fraudulent or preferential transfers) or objected to a single proof of claim (other than the Landlord Claim).  When asked at the Hearing to explain the Debtor's unwillingness to investigate pre-petition transfers or investigate potential objections to claims, including, most notably, the Insider Claims, the Debtor's counsel stated that such investigations are premature, and that the Debtor would undertake such investigations "when the time comes."  Yet, what particularly troubles the Court is that, despite the Court's repeated questioning, the Debtor's counsel failed to provide a justifiable explanation as to *why* such investigations are allegedly premature and *when* it would be an appropriate time, in this case that has been pending for two and a half years, to begin conducting such investigations, which undoubtedly fall within a debtor-in-possession's obligations as a fiduciary of the estate.  Instead, the Debtor prefers to proceed solely with litigating his dispute with the Landlord and apparently only *then*, after resolving his dispute with the Landlord, begin to perform these basic and essential fiduciary duties.  The Court finds that the Debtor's unjustified refusal to evaluate his own pre-petition

actions and to investigate claims that are held by insiders evidences the unhealthy conflict of

interest in this case, and highlights the need to appoint a neutral trustee to carry out, in an

unbiased manner, the Debtor's fiduciary duties.

In addition, the Debtor's failure to file the periodic reports required under Bankruptcy

Rule 2015.3, which manifests a lack of disclosure and inadequate reporting, further supports the

appointment of a trustee.  Under Bankruptcy Rule 2015.3, a debtor-in-possession is required to

file periodic reports setting forth the value, operations, and profitability of each entity, other than

an entity that is publicly traded or is a debtor under the Bankruptcy Code, in which the debtor's

estate holds a substantial or controlling interest.  *See* Fed. R. Bankr. P. 2015.3.  Such reports

("Periodic Reports") must be based on the most recent information available to the debtor-in-

possession.  *See* Fed. R. Bankr. P. 2015.3(a).  The first Periodic Report was due no later than

seven days before the first date set for the meeting of creditors, and subsequent reports were

required to have been filed no less frequently than every six months.  *See* Fed. R. Bankr. P.

2015.3(b).  The Debtor filed his first Periodic Report on March 25, 2014 [ECF No. 19], and four

months later, on July 30, 2014, he filed a second Periodic Report [ECF No. 54], which amended

the first Periodic Report.  However, since then, and until the eve of the Hearing on the Debtor's

Motion, the Debtor has failed to file any additional Periodic Reports for over the past two years.

*See* ECF Nos. 265, 266, 267 and 268, each dated November 2, 2016.  The Debtor has not

offered any excuse for his failure to file Periodic Reports.  Thus, there is a clear and convincing

record, throughout this case, of the Debtor's failure to file Periodic Reports as required under

Bankruptcy Rule 2015.3.  The Debtor's delinquent filing of four reports on the eve of the

Hearing does not excuse the Debtor's conduct or otherwise constitute compliance with the

Bankruptcy Rule.  Based upon the failure to timely file Periodic Reports, coupled with the

Debtor's questionable dealings with at least one of the limited liability companies in which he holds an interest, particularly given that these interests are the Debtor's most significant assets, the Court finds the Debtor's non-compliance with the Bankruptcy Rules to be further grounds for the appointment of a trustee.

The Court is also concerned with the Debtor's seemingly inappropriate relationship with FREA, in which he holds a 95% interest.  By the First Third-Party Fee Payment Application, the Debtor sought, on an emergency basis, an order authorizing FREA to pay the legal fees and expenses of R&E and the Debtor's bankruptcy counsel, Pick & Zabicki LLP ("P&Z" and together with R&E, the "Debtor's Counsel").  The application explained that, "[a]t the Debtor's request, FREA has agreed to borrow amounts from a third party source[11] and to utilize those funds to pay [the Debtor's Counsel] . . . ."  First Third-Party Fee Payment Application, at ¶ 11. The Debtor stated that "repayment of the amounts borrowed by FREA will not be personally guaranteed by, and shall be without recourse to, the Debtor or his estate" and that "FREA will not be asserting any claim in the Debtor's chapter 11 case on account of the monies borrowed and paid by FREA to [the Debtor's Counsel], either directly or by way of subrogation to the rights of [the Debtor's Counsel] concerning the amounts paid."  *Id.*  At the hearing to consider the relief requested in the First Third-Party Fee Payment Application, which was opposed by the Landlord, the Court expressed its serious concern with the Debtor's use of FREA - - the Debtor's interests in which is one of his most significant assets - - for payment of his personal expenses in his bankruptcy case, and ultimately denied the First Third-Party Fee Payment Application.[12]

---

[11] The identity of such "third party source" was never disclosed to the Court.

[12] As a general matter, when considering a debtor's request for authorization of payment of its attorney's fees by a third party, bankruptcy courts in this District typically require that (1) the arrangement be fully disclosed to the debtor, as client, and to the third party payor; (2) the debtor expressly consents to the arrangement; (3) the third party payor retains independent legal counsel and understands that the attorney's duty of undivided loyalty is owed exclusively to the debtor – and not the payor -; (4) the factual and legal relationship among the third party payor, the

Thereafter, the Debtor submitted the Second Third-Party Fee Payment Application, pursuant to which the Debtor sought authorization for his father, Jack Ancona, who has filed, signed or otherwise holds the Insider Claims against the Debtor, to pay fees and expenses of R&E.[13]  After conducting the Fee Hearing, the Court denied the application, partly due to the lack of disinterestedness and the apparent conflicts of interest and partly due to the lack of candor and transparency in connection with the application.  Specifically, Jack Ancona testified at the Fee Hearing that he had participated in at least one meeting with the Debtor and his counsel, at which case strategy was discussed.  *See* Tr. of June 15, 2016 Hearing at 68:16-72:23, 77:2-7, 84:21-85:-9.  In addition, the Second Third-Party Fee Payment Application failed to disclose Jack Ancona's interests in the SPE LLCs, which are co-defendants with the Debtor in the Fraudulent Conveyance Action.  *See id.* at 72:24-73:18.  The Court finds that the third-party fee payment applications are further evidence of the conflicts of interest that plague this case.

In sum, the Court finds that the Landlord has presented clear and convincing evidence demonstrating: (1) the Debtor's conflict of interest; (2) the Debtor's failure to comply with his fiduciary duties; (3) the Debtor's failure to make disclosures and comply with the reporting requirements under Bankruptcy Rule 2015.3; and (4) the Debtor's attempted use of FREA to pay his personal attorneys' fees in this case, which application was fraught with conflicts and lack of

---

debtor, the respective attorneys, and their contractual arrangement concerning the fees, be fully disclosed to the Court at the outset of the debtor's bankruptcy representation; (5) the debtor's attorney must demonstrate and represent, to the court's satisfaction, the absence of facts which otherwise create non disinterestedness, actual conflict, or impermissible potential for a conflict of interest.  *See In re Lar Dan Enterprises, Inc.*, 221 B.R. 93, 96 (Bankr. S.D.N.Y. 1998) (internal citation omitted).  These factors, commonly referred to as the *Lar Dan* factors, are typically demonstrated to the court by means of an affidavit, commonly referred to as a *Lar Dan* affidavit.  In addition to concluding that the *Lar Dan* factors had not been satisfied, the Court also stated on the record at the hearing on the First Third-Party Fee Application that it was troubled by the fact that the *Lar Dan* affidavit, submitted as part of the First Third-Party Fee Application on behalf of FREA, was sworn to by the Debtor, and that FREA, one of the Debtor's most significant assets, would be incurring debt to an undisclosed person or entity in order to finance the Debtor's personal bankruptcy counsel fees.

[13] R&E sought authorization to withdraw as special counsel to the Debtor as alternative relief in the event that the Court were to deny the Debtor's request for authorization for his father to pay his legal fees.

candor and transparency.    Based on these facts and the facts on which the Court based its

finding of "cause" under section 1112(b), discussed above, the Court concludes that ample cause

exists for the appointment of a chapter 11 trustee in this case.

## 2. *Appointment of a Chapter 11 Trustee Under § 1104(a)(2)*

Even if a court does not find that cause exists to appoint a chapter 11 trustee under

section 1104(a)(1), the court may still appoint a trustee under section 1104(a)(2) if such

appointment is in the interest of creditors, any equity security holders, and other interests of the

estate, without regard to the number of holders of securities of the debtor or the amount of assets

or liabilities of the debtor.  *See* 11 U.S.C. § 1104(a)(2).  Although the Code does not define the

"best interests of creditors," applicable case law makes clear that courts are required to consider

and weigh the totality of facts and circumstances of each case when determining what is in the

best interests of creditors.  *See, e.g., Hampton Hotel Investors, L.P.*, 270 B.R. at  359.  When

considering whether to appoint a trustee under section 1104(a)(2), "courts eschew rigid absolutes

and look . . . to the practical realities and necessities."  *In re Ionosphere Clubs, Inc.*, 113 B.R. at

168 (internal citation omitted).  In doing so, bankruptcy courts consider: (i) the trustworthiness of

the debtor, (ii) the debtor's past and present performance and prospects for reorganization; (iii)

the confidence – or lack thereof- of the creditors in the present management; and (iv) the benefits

derived by the appointment of a trustee, balanced against the cost of the appointment.  *See In re*

*Ionosphere Clubs, Inc.*, 113 B.R. at 168; *In re 1031 Tax Group, LLC*, 374 B.R. at 91.

The Court finds that the grounds, discussed above, for the appointment of a chapter 11

trustee under Code section 1104(a)(1), and the grounds upon which the Court based its

conclusion that the Debtor's case was commenced in bad faith under section 1112(b), support a

finding that the appointment of a chapter 11 trustee is also warranted under section 1104(a)(2).

The Court concludes that, under the circumstances of this case as discussed above, the appointment of a chapter 11 trustee is in the best interests of all creditors and the estate. An independent trustee is obligated under section 1106 of the Bankruptcy Code to carry out the fiduciary responsibilities which the Debtor, to date, has unjustifiably refused to fulfill, namely, to "investigate the acts, conduct, assets, liabilities and financial condition of the [D]ebtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan". 11 U.S.C. § 1106(a)(3). In addition, the conflict and acrimony between the Debtor and the Landlord, which has been ongoing for approximately eight years, is at the heart of the Debtor's bankruptcy case and, according to the Debtor, serves as the basis for the lack of progress the Debtor has made over the past two and a half years, may be alleviated, to some extent, by the presence of a neutral trustee. Moreover, the appointment of a trustee will foster transparency in this case and bolster confidence of the Debtor's creditors and transparency, since a chapter 11 trustee is obligated, in an unbiased manner, to conduct investigations to determine the propriety of objecting to claims (in addition to the Landlord Claim) and commencing actions to recover pre-petition transfers, and ultimately file a disclosure statement and propose a chapter 11 plan. The Court determines that the benefit of such independent investigations and related progress in the case that will be facilitated by the appointment of a trustee will far outweigh any costs to the estate associated with such appointment. The Court therefore concludes that, given the totality of the facts and circumstances of this case, as discussed above, the appointment of a neutral trustee is in the best interests of the estate and all parties in this case, and will present the best way forward to the pursuit of all appropriate actions to maximize the estate for the benefit of all creditors and the ultimate conclusion of the case.

### III.    CONCLUSION

For the reasons set forth above, the Court denies the Motion insofar as it seeks to convert the Debtor's chapter 11 case and grants the Motion insofar as it seeks the appointment of a chapter 11 trustee under section 1104(a).

**IT IS SO ORDERED.**

Dated: New York, New York
        November 30, 2016

_s/ Mary Kay Vyskocil_
Honorable Mary Kay Vyskocil
United States Bankruptcy Judge